(No. 22440.—

THE PEOPLE OF THE STATE OF ILLINOIS, Defendant in Error, *vs.* ASHER EARL BENTLEY, Plaintiff in Error.

*Opinion filed June 19, 1934.*

F. A. ORTMAN, NEIL KERR, and ADSIT, THOMPSON & HERR, for plaintiff in error.

OTTO KERNER, Attorney General, ROBERT M. NIVEN, State's Attorney, and J. J. NEIGER, for the People.

Mr. JUSTICE SHAW delivered the opinion of the court:

Plaintiff in error was tried on an indictment in the circuit court of Livingston county for the murder of Aldine Younger, alleged to have been committed on March 1,

1933. He was convicted of manslaughter and sues out this writ of error to review that judgment.

Inasmuch as the case must be decided upon its facts it will be necessary to state them with some particularity.

The body of the deceased was found lying in a pool of blood on the concrete pavement on Route 116, about three and one-half miles west of Pontiac, Illinois, in the early morning of March 1, 1933. Death had been instantaneous and caused by terrible injuries. The skull was fractured crosswise from ear to ear, fractured at the base of the brain, and also from the transverse fracture down the median line to the base of the skull. One clavicle was broken and also seven ribs on one side and eight on the other, those on the left side being broken away from the backbone a distance of an inch or more and all of them separated from the sternum. The brain was loose in the skull cavity and torn from the spinal cord by a macerated wound. One rib had punctured a lung and the pleural cavity was found to be full of blood, as was also the skull and brain, the blood being down into the convolutions thereof. The left humerus was also fractured, and the body showed signs of other contusions, lacerations and bruises from head to foot. The face was uninjured except for a V-shaped cut, where a tooth had evidently made a puncture. The body was dressed in a gray fur coat, which had a tear eleven inches long down the left sleeve and another tear near one of the left buttons. The medical findings are all established by the testimony of the eight doctors who conducted the autopsy and there is no dispute among them. They all agree that the brain injury caused instant death and that said injury and the puncture of one lung by a broken rib occurred at practically the same instant. Neither is there any material dispute as to any other fact in evidence, excepting only as to the testimony of the witness Schrigley, which will be particularly considered later in this opinion. Except as to his statements the testimony of all of the wit-

nesses, including those for the People and for the defendant, and including the testimony of the defendant himself, is harmonious and consistent. While there are minor discrepancies on immaterial points, no major or important dispute is present.

The plaintiff in error (who for convenience will be called the defendant) on March 1, 1933, was a married man forty years old, living with his wife and his father in the city of Pontiac. He and his father operated a rather large farm north of Pontiac upon which considerable livestock was raised, and in these operations they used an old Pontiac two-door coupe in driving to and from the farm. In this car there were ordinarily carried a couple of hammers, some nails, staples, bolts and other such utensils convenient in fixing fences and doing odd jobs about the farm. The car was a 1925 model and the wiring was considerably out of order, frequently burning out a fuse and requiring a replacement in that respect. The deceased, Aldine Younger, was approximately twenty years old, living in Pontiac with sisters and working in a small store there.

State highway Route 4 runs through Pontiac in approximately a north and south direction. Route 116 goes straight west from there. The first three miles of Route 116 west from Pontiac are of brick and from there on to the west is concrete. On this road, four miles west of Pontiac, on the north side of the highway, is the Tom Hutson timber—a forest of natural trees from 50 to 70 feet in height and extending 50 or 60 rods along the highway. Back in this timber is the residence of Tom Hutson. A little over 1000 feet east of the lane leading into Tom Hutson's farm is the residence of John Hutson, his son. This residence is set back from the highway about 100 feet, not built square with the highway but at an angle of 75 degrees. By actual survey it is 1035 feet from the nearest point of this house to the spot where the body of the deceased was found.

The record shows that at the time of the events here in question there were several places in and around Pontiac where various kinds of drinks might be obtained, principally "spiked" beer and gin. On the afternoon of February 28, 1933, the defendant was drinking liquor in several of those places. That evening, with Roy Holmes, he drove to the home of the deceased and called for her, asking if she wanted to go out and have a few drinks. She said she could not go then but that he should come back later. Later in the evening, a little after 8:00 o'clock, the defendant drove around by her house and found her standing on a corner. They went together to Chuck's Place, where defendant obtained a pint of alcohol, and from there to a place known as the Log Cabin. They stayed in that place until some time between 11:00 o'clock and midnight, where they were seen together by a great many of the People's witnesses as well as by witnesses for the defense, this point not being in dispute but admitted by the defendant and testified to by him. During this time they were constantly drinking and dancing to the music of a radio. It is testified to by the defendant, and likewise by witnesses for the People, that during this time the deceased insisted that she wanted to go to a town by the name of Dana; that some young man had broken an engagement with her for that evening and she wanted to "check up" and see whether or not he was attending a dance over there. At a little before midnight the defendant finally consented to take her there. Lawrence West, a witness for the People, testified that the defendant protested that he did not want to go but finally consented. He also testified that they asked him, and another young man by the name of Babington, and another young man by the name of Selotti, to go with them. None of the others would go. Another witness for the People, Jesse Zitzthum, testified that she asked him to take her to Dana and that he declined. An-

other witness for the People, Frank Schultz, also corroborates this point.

Louis Osterman, who was a driver for the Blumer Brewing Company delivering near beer, testified that he left Pontiac about midnight on the night in question, going west on Route 116; that at a point about eight or nine miles west of Pontiac he met the defendant's car coming slowly in an easterly direction without any lights and in the middle of the road; that when the car got within the range of his lights it pulled off to the south side of the pavement and stopped and a lady put out her hand and waved at him. The lady was driving. He testified he was acquainted with the deceased and recognized her when he stopped his truck alongside the Pontiac coach; that he asked her what the trouble was, and she answered, "Nothing;" that she then got out of the car and came over toward the truck cab, whereupon she said, "Oh, it's the Blumer man;" that he asked her if she was out of gas, and she said "No;" that he asked her what was the trouble with her lights, and she said they were burned out; that he asked her where they were headed for, and she said, "Dana or Pontiac; she didn't give a damn;" that he said, "Well, if I can't help you any I will go on home;" that she said, "You wait until I get the car started;" that she then got back in the car and started it and that he drove on; that he did not exactly see anybody with her in the car but thought he saw somebody moving in it; that he could not say who it was—whether a man or a woman—but that the person who was moving was in the back seat and moved after she got over to the truck. This witness, who testified for the People, thought this was approximately from fifteen to twenty minutes after 12:00 o'clock; that he thought she did not seem to walk very straight, but he said she drove the car away all right and that was the last he saw of her. On cross-examination he stated that he thought she was slightly intoxicated, and that he noticed

when she got back in the car she shut the door on her coat, which was hanging out a little bit as she drove away.

Darrel Giller, for the People, testified that about 12:30 he was driving west on Route 116 and that he met a Pontiac coach traveling in an easterly direction without lights, but he could not say whether a man or a woman was driving it; that it was on the south side of the road and being driven slowly, close to the black line, about four miles west of the intersection of Route 4 and Route 116.

Lyle Raber testified for the People that he attended a dance in Pontiac on the evening in question, took his young lady home after the dance and left Pontiac about 12:25 A.M. He lived two miles west and three and one-half miles south of Graymont, which made his route home west on Route 116; that he went west on the road about fifty miles an hour and did not meet any car until in the vicinity of the John Hutson house; that as he approached that location he saw a light object in the middle of the road which he first thought a calf or some animal; that when he was about 100 feet from it he could tell it was a woman standing in the center of the road, wearing a light coat; that when he got close to her she threw up her hands and screamed at him; that she was then in the center of the road and that he missed her by dodging around to the right and did not stop but kept on, going to his home; that a little west of where he missed the woman standing in the middle of the road there was a car parked on the south side of the road without lights, and that this was about 150 feet east of Tom Hutson's lane, and he testified quite positively that the car parked without lights was a Pontiac coach and that he did not see anybody in or around, it as he passed; that he continued west on Route 116, and about three miles further west there were two cars coming from the south onto the pavement and another that had just turned out of a yard onto the hard road, all of them coming east. · This witness also testified, on re-direct

examination, that about a quarter of a mile east of the end of the brick pavement, which would be approximately a mile east of the place where the body was found, he had noticed in his rear view mirror the reflection of lights of a car back of him but that he did not remember seeing it afterwards.

Bessie Wildhaber, Cletus Wildhaber, Charles Rieck and John Smith all testified that they were coming east on Route 116 at about a quarter to 1:00 that morning, having turned onto that road at a point about four miles west of where the body of the deceased was found. They all testified that after driving east on Route 116 for some distance they met a large car coming west at a high rate of speed and without dimming its lights. The place where they met this west-bound car was about a mile and a half west of where they afterwards found the body of the deceased. The People's witness Smith testified that this car coming from the east was a big car with bright lights and was driven very fast. It could not have been the car of the witness Raber, who previously testified, as it was his testimony that he did not meet any other car except the unlighted Pontiac until he turned off of the hard road, and that he saw the cars about ready to turn onto the hard road, which must have been those in which Smith and the others were riding.

The Smith party discovered the body, went to a farmer's house and telephoned the sheriff's office. In the meantime, and while the Smith party had evidently gone to telephone for the sheriff, another car containing John R. Bowen, Victor Kendelberger and Corbley H. Bowen, coming home from Dana, where they had attended a dance, also discovered the body. They went immediately to the John Hutson farm house, which was the nearest place, and tried to arouse someone but could not. They all testified that they knocked on the door, kicked on the screen, shouted and hammered on the side of the house but did

not get any response; also that several dogs in the yard began barking while they were there but that they saw no signs of life and left, proceeding to Pontiac, where they drove into an oil station at the junction of Route 116 with Route 4 and called Harris, an undertaker who maintained an ambulance.

This is the substance of the testimony for the People, except as hereinafter stated. Several other witnesses were called and testified, but for the most part their evidence was cumulative and corroborative, not developing any new facts other than as hereinbefore set forth.

The witness upon whom the People relied entirely for any proof that the deceased came to her death by means of a criminal act was Wesley B. Schrigley, a hired man in the home of John Hutson, and it is necessary that we consider his testimony in considerable detail. He testified that he was thirty-two years old and living at the home of John Hutson, where he had been doing chores since Thanksgiving day; that on the afternoon of February 28 Hutson went to Chicago with a truck, and Hutson's wife and another person who was living there went over to Tom Hutson's to stay all night, leaving him alone in the house. This house, as stated in the beginning of this opinion, stands 1000 feet east of the lane leading up to Tom Hutson's house, where the body was found. The witness testified that he went to bed that night about twenty minutes after 8:00 in the southwest room, up-stairs; that there are two windows in that room, one facing south and one west, and that there are two more rooms up-stairs, one east of the room where he was sleeping and a north room; that there are three windows in the north room, one on the west and two on the north side of the room, and a door between the north room and the southwest room, where he was in bed; that the northwest window in the north room, being the room adjoining the one in which he was sleeping, was open four or five inches from the

bottom, but that there was no window open in the room in which he slept; that he was awakened by some shouting in the night and got up and looked out of the window of the southwest room; that there was a car going across the Rooks creek bridge and that he saw somebody walking down the lane that goes up to Tom Hutson's house, over a fifth of a mile from where the witness was standing; that he could see the figure of a woman and it was dressed in light gray; that he heard a car start up, and then he went back to bed; that while he was in bed in the room above described he heard a conversation which appeared to be down at the lane leading to Tom Hutson's; that he heard a man say, "What the God damn hell is the reason you don't want to ride back to town with me?" and that somebody answered him but he could not understand what was said; that then the man's voice said, "How the hell are you going to get back to. town?" and that the woman's voice said, "I will walk before I will ride back with you;" that the man's voice said, "By God, do you think you can go out with me and then flag a ride back to town with somebody else and get by with it?" that the woman's voice said, "You might as well go back to town, Earl Bentley, because I am not going to ride back in with you;" that the man's voice then said, "Yes, and you told Clara not to go out with me; I will be God damned if you can do that with me and get by with it;" that they talked a little longer, and she then said, "When a girl does go out with you, you never treat her right." The witness testified that he thereupon lay down and went to sleep; that thereafter he was awakened by a scream; that he got up and looked out of the west window of the southwest room but did not see anything; that he looked out of the west window of the north room and saw nothing, and then went back to the west window of the southwest room and saw somebody bending over and straightening up three or four times; that there was a gray object lying in the road

up by Tom Hutson's driveway, and that the man who bent over and straightened up three or four times stepped over this gray object and ran west 15 or 20 feet, stopped, looked back over his left shoulder, and then ran west into the shadow of a big cottonwood tree on the south side of the road; that he heard a car door shut and a motor start and the car then pulled out on the pavement, shifted into second gear, and after the driver got on the pavement he drove up to about 15 feet of this gray object, turned a bit to the south and drove over it; that he drove on a little ways, shifted into third gear and proceeded east; that just before he went past the timber there was a light in the car, and that the driver was bending over to the right, apparently looking at something in the car; that the witness did not know whether the light was a match or a flashlight, but did not believe it was a dashlight as it was too low down in the car; that there were no head-lights or other lights on the car, and that the car continued east and there was only one person in it; that it was a still, cold night and pretty light; that afterwards he heard some knocking on the door and got up and dressed and went down-stairs but there was no one there; that the next morning, about 7:00 o'clock, he learned of the death of Aldine Younger; that after the car had gone east the gray object in the road was still lying on the pavement, and that the next morning he saw the pool of blood on the road.

On cross-examination the witness testified that on the next morning, March 1, he went down on Route 116 to the place where the blood was on the pavement; that Tom Hutson was there, Mr. Kammerman and Mr. Patterson; that Hutson was the only neighbor there; that there was a photographer taking pictures, and that the State's attorney was there afterwards, and that at that time he knew the State's attorney and the sheriff; that the first time he talked to the State's attorney about the case was approxi-

mately the first of July, four months after the death of Aldine Younger. He further testified on cross-examination that on the night in question there was no window open in the room where he was sleeping but one in the adjoining room was open about three inches; that when he heard the shout and got up the first time he could not see the person very distinctly a fifth of a mile away; that she walked from the slab up to the gate; that she wore a light-gray coat, and he was sure it was not brown or any other color than gray; that he saw this while he was standing, stooping over, looking out the west casement window, which was closed; that when he heard the conversation he had testified to he was in bed, propped up on one elbow; that he was quite certain the female voice used the name Earl Bentley and not Asher Bentley, Ash Bentley or Skinny Bentley; that he heard the name Clara distinctly, and that he was perfectly sure it was not Carrie or Sarah; that he immediately lay down and fell soundly asleep; that he was awakened for the second time by a scream which he heard, as though someone was in distress. He described in detail how he stooped down and looked out of the west window in his room but did not see anything, then went to the north room and looked out of the west window and did not see anything, then looked out of the northeast window and did not see anything, and then came back and looked out of the southwest window and saw the object on the pavement, on the slab; that its color was gray—the same shade of gray as the person he had first seen at the Hutson gate; that it could not have been brown or light-brown and that he could see it quite plainly; that he could not see the black line in the center of the pavement but could see the full width of the pavement; that the person was standing over the object in question, and that the body was lying just about where the east pool of blood was found the next morning. He testified that there were seven or eight pools of blood, (all the other

witnesses said three,) and that the object was lying about where the east pool of blood was; that the man standing on the pavement was bending over and straightening up; that he thought he was picking something up off the pavement and that he was moving his right arm; that this occurred four or five times, but that witness could not see his left arm but just his right arm, and that was going up and down as he bent up and down; that he saw the man run 12 or 15 feet to the west and saw him turn and look back; that he was sure he looked back over his left shoulder; that he saw the car drive up to the object lying in the road and saw the car run over it; that the left wheels went over the north end of the object and the right wheels went over the south end of the object, and that he was certain that both wheels on both sides of the car, being all four wheels, ran over it. The witness testified that after seeing all this he lay down and again went soundly asleep, to be awakened for the third time that night by the pounding on the house, to which he did not respond while anyone was there.

The witness further testified on cross-examination that his curiosity was not particularly aroused by the stirring events he had seen because he thought there had been a wreck on the hard road, and that thereafter he went back to sleep; that before he went to sleep he looked out of the window and saw the gray object still lying on the pavement; that he was sleeping pretty soundly when the knocking came upon the side of the house and the door, which awakened him for the third time; that the dogs were barking; that he did not raise the window or call or turn on a light but that he put on his pants and went down-stairs and there was no one there; that he heard somebody say, "Come on; let's go; there is no one home," but that he did not call to them or hear anyone calling his name or calling "Johnny." He said that he afterwards heard there were three boys out there. He further testified that he

did not hear anything out there, did not see the ambulance or the sheriff when they came to pick up the body, or know anything about what had happened until 7:30 or 8:00 o'clock the next morning; that he then figured he had been a witness to a murder, but he did not say anything about it to anyone; that he lived at John Hutson's over the winter and knew him pretty well, but he did not tell him what he had heard when Hutson came home; that he went to work thereafter for Ira Zook on the third of March; that Zook took the newspapers, and that they discussed the case in Zook's home but he never told him anything about it; that he did not testify at the preliminary hearing, at the coroner's inquest or before the grand jury, and that he never talked to anyone until early in July—almost four months afterward. The record does not disclose by what means the State received information of the availability of this witness.

The record discloses that at 3:30 in the morning of March 1, being within a couple of hours of the death of Aldine Younger, the sheriff, policemen and others went to the home of the defendant and arrested him. He was in bed and asleep at the time, was called by his wife, got dressed and went with the officers to the jail. There is evidence in the record of various statements made by the defendant at the jail, none of which are particularly material on this inquiry and are not in any way in conflict with the material facts disclosed by other evidence. At the same time they took his car, which was found in the garage, to the jail and kept it there. The car had its lights all burned out when the sheriff took it and also had traces of blood on the wheels on the left side and left fender.

This is not all of the evidence introduced by the People, thirty-five witnesses having been called, but it is sufficient to give an outline of the facts so far as they are material. In addition to the foregoing testimony of witnesses the People introduced in evidence various plats, diagrams and

photographs, the latter showing the highway where the pools of blood appeared, and showing in one of them car tracks passing through the blood and tracking it down the road. This photograph makes it apparent that more than one car took blood away from there on its tires.

The defendant introduced the evidence of twenty witnesses besides himself, but it will be unnecessary to abstract all of it in this opinion. As above indicated, there is no discrepancy of any importance between the testimony for the People and the defense, except as to the evidence of the witness Schrigley.

The defense introduced the testimony of six physicians and surgeons who were present at the autopsy, in addition to those who had testified for the People. The defendant's medical evidence did not controvert anything proved by the People, but extended the proof to show that in addition to the injuries described by Dr. McNally the deceased had an arm broken between the elbow and the shoulder. It was established by these physicians, and not controverted by the People, that the basal skull fracture, the tearing loose of the spinal cord, and the chest injuries, all occurred at the same time; that death was instantaneous, and that the injuries shown could only have been produced by terrific and violent force suddenly applied.

John Smith testified for the defense that the morning after the body was found he came past the Hutson house and had a talk with Schrigley; that Schrigley said to the witness, "I heard somebody got killed last night," and the witness replied, "The hell they did;" that Schrigley then said, "It is funny; I was sick all night and never heard anything about it."

Andrew Jacobs testified for the defense that he was at a service station at the corner of Route 4 and Route 116 about 12:30 A. M.; that he stayed there until after 1:00 o'clock, and that while he was there he saw a big, dark-colored car turn from Route 4 onto Route 116, going west,

making the corner at about forty miles an hour and going off the pavement in doing so. Cletus Wildhaber, who testified previously for the People, was called by the defendant and stated that he had met what was apparently this same car, traveling west with bright lights and at an excessive rate of speed, at a point some distance west of where the body was found. Charles Reick, who was riding with Wildhaber, corroborated this testimony, as did Bessie Wildhaber in her previous testimony for the People. The defendant also introduced the evidence of a civil engineer identifying some plats and giving exact measurements; the testimony of a deputy sheriff to the effect that after the defendant had been arrested he made the statement that he had nothing to conceal and was willing to tell his entire story, but that his attorney refused to permit him to tell anything. The defense also introduced in evidence an almanac showing that there had been a new moon four days previous to the death of Miss Younger and that the moon had set that evening at 10:25 P. M. The defendant also introduced the evidence of a witness named Carroll, who testified to having been drinking with him from 3:30 until after 6:00 o'clock in the evening before the occurrence in question, and that when the witness left the defendant, some time after 6:00 o'clock, the defendant was partly intoxicated.

The defendant took the witness stand himself. Omitting the non-essential parts of his testimony and confining our review to those matters pertaining to Miss Younger and her death, the defendant's evidence was in substance as follows: He had been acquainted with Miss Younger probably three or four years prior to her death; that he met her at a place known as the Wilmington Gun Club, about a mile south of Wilmington, which was a place where drinks were sold and with a small dance floor; that he had seen her there frequently on occasions when they had fish frys and chicken frys and from time to time

drank and danced with her; that there had never been any sexual relations or attractions between them but that he considered her a "good fellow" with whom he liked to dance, and that he had occasionally stopped at a store belonging to her brother-in-law, where she worked, buying small things; that while he considered himself a friend of hers and well acquainted with her, he had never been anywhere with her alone until the night in question. He further testified that on the day preceding the night of her death he had worked at the farm from 5:30 in the morning until about 3:00 o'clock in the afternoon, when he came home, changed his clothes and went to the place known as the Log Cabin, in Pontiac; that he and Carroll and some other boys had had several drinks at the Log Cabin and at Frenchy's, drinking gin, spiked beer and alcohol, until supper time, when Carroll went home; that he did not have any supper that night, but that a Mr. Selotti suggested that they had better leave the Log Cabin, as they were getting pretty loud around there; that he, Roy Holmes and Ed Chattin left the Log Cabin and went to the Chevrolet Garage, from whence Carroll went home; that Chattin later on took him back to the Log Cabin, where the witness got his car and went back to the Chevrolet Garage; that he and Holmes then went to another place where they had a lunch room and had two more bottles of beer spiked with alcohol, and that he and Holmes then proceeded to the home of Miss Younger, substantially as told by Holmes for the People. Witness testified that after Miss Younger got in his car he drove to a place called "Chucks'," where he went in and got a pint of alcohol while Miss Younger sat in the car; that they then went to the Log Cabin, at which place she suggested that she wanted to go to Dana. He testified that she said she had had a date for that night and that her "boy friend" had called up and canceled it; that she was under the impression that he had gone to a dance at Dana and that she

wanted to go over and find out; that he did not have any money and did not want to go to Dana; that they sat in the Log Cabin and drank spiked beer and talked, his testimony being substantially the same as that of the witnesses for the People, including her requests of various persons to take her to Dana. He testified that she told him that if he would take her over to Dana she would catch a ride home and that he would not need to wait for her. He then testified that when they started from the Log Cabin he was driving and that the lights on his car were all right; that they went south to Route 116, where they turned west, and that after going a little way on that road he stopped on the right-hand side of the road, got out of the car and went behind it to urinate; that when he came back and got into the car Miss Younger was in the driver's seat, before which time she had been in the back seat; that she said, "You are too drunk to drive; I'll drive;" that he then lay down in the back seat and went to sleep; that he did not know how far west they went or when or where they turned around; that he had heard the testimony of Osterman, who drove the Blumer beer truck, but did not hear any of the conversation on the road as testified to by Osterman and did not have any recollection of it having occurred; that when he woke up Miss Younger said, "Asher, the lights are out;" that he replied, "For Christ's sake, stop driving;" that she stopped and that he was still lying in the back seat and did not get out; that he remembers her saying to him, "I am not going to sit here all night; I am going to flag a ride;" that he thought she got out but was not sure, as he was still lying down in the back seat; that he went to sleep again; that he did not know how long he slept but was awakened by hearing a car go by on the hard road; that he roused up and called out two or three times to Miss Younger but got no answer and then started up the car and came home; that on the way home he did not see any object on the pavement and

did not run over any object that he knew of; that it was pretty dark there and that he had no lights; that he did not know exactly where his car had been standing, but it was along some timber and that it was darker there than it was further on toward Pontiac; that he thought he probably could have seen an object, such as the body of a woman, lying in the road if he had looked for it, but he did not see anything; that he could see the outline of the pavement by looking ahead; that after he had driven a ways he came to the brick pavement, which would be three miles west of Pontiac, and proceeded to his home, put the car in the garage and went to bed and to sleep. He then told of his being awakened and arrested and of various conversations between himself and the arresting officers, none of which are necessary to this opinion. He testified that he and Miss Younger did not have any quarrel or misunderstanding of any kind. The cross-examination which followed was uneventful, neither adding to nor detracting from the witness' story on direct examination.

Upon a trial for murder, the *corpus delicti,* which must be proved beyond a reasonable doubt, consists of two parts or essential elements: The fact of death, and the fact that the death was produced by the criminal agency of some person. (*Hoch* v. *People,* 219 Ill. 265; *Campbell* v. *People,* 159 id. 9.) Before a conviction can be sustained upon circumstantial evidence the guilt of the defendant must be so thoroughly established as to exclude every reasonable hypothesis that he is innocent. (*People* v. *Ahrling,* 279 Ill. 70.) Evidence which does little more than raise a suspicion of the guilt of the defendant will not justify a conviction. (*People* v. *Ahrling, supra.*) It is always the duty of the court to resolve the circumstances in evidence upon a theory of innocence rather than upon a theory of guilt where it is reasonably possible to do so. (*People* v. *Dewachter,* 353 Ill. 266.) Applying these principles, and disregarding for the moment the testimony of Schrigley,

which will be discussed later in this opinion, the record before us can hardly be said to raise even a suspicion of the defendant's guilt. With the exception of this one witness there is no important dispute in the entire record between the witnesses for the People and those for the defendant, and all of the evidence, both testimonial and circumstantial, points with irresistible force to an accidental, rather than a felonious, death.

There is an entire absence of any motive on the part of the defendant to wish to kill the deceased. It is undisputed that the automobile trip was made on her insistence and was not desired by the defendant. It is established that both he and the deceased invited others to go along and that they would not do so. It is clear that they had both been drinking—the defendant to excess and probably to such an extent as to make it entirely probable that he would want to sleep. It is established by the People's witnesses that the deceased was seen driving the car without lights in a direction toward the place where she was later found dead, and that if the defendant was then present he was lying down and was out of sight. It is established by the People's witnesses that the deceased was trying to flag a speeding car, standing dangerously in the center of the road and being narrowly missed by it. It is established by the People's witnesses, as well as those for the defense, that a speeding car, which was never afterward accounted for, passed the precise spot where Miss Younger was killed, within a very few minutes prior to her being found dead. All the evidence of all the witnesses, except that of Schrigley, corroborates the story told by the defendant on the witness stand.

The condition of the body, as shown by the united testimony of eight physicians and surgeons who attended the autopsy, clearly indicates a death resulting from being struck and thrown upon a pavement. The condition of the skull was very much like that of an egg which had

been broken by coming violently in contact with a flat surface—not as if it had been broken in with a hammer or other instrument but simply broken from a severe concussion. It was proved beyond doubt that death was instantaneous, and that all of the wounds to the skull and brain, as well as to the lung, which was punctured by a broken rib, took place at the same instant. The medical testimony was to the effect that when the skull was broken and the brain torn loose from the spinal cord death occurred instantly, as one doctor expressed it, "in the middle of a heart beat."

It was apparently the People's theory that the defendant beat the deceased over the head, causing death, and then ran his automobile over her, causing the broken ribs and other injuries. There are several reasons why this theory is untenable. There is no evidence of a weapon of any kind being used upon the deceased, found in the possession of the defendant or at the scene of the death. Furthermore, the medical testimony was to the effect that pieces of skull were broken and forced outward, whereas a beating would have driven them in. It would be impossible for a beating without a weapon to have produced the physical results shown by the body.

The doctors testified that instant death resulted from the skull fractures, and that if the chest injuries had been inflicted later there would then have been no blood in the pleural cavity. If it be contended that the chest injuries were caused by the defendant's car running over the body the injuries to the skull are unaccounted for, and if, on the other hand, it be contended that the automobile ran over the head and thereby caused the fatal skull fractures, the blood in the pleural cavity is unaccounted for. Bearing in mind the rule that circumstantial evidence must be interpreted upon a theory of innocence rather than one of guilt where that is reasonably possible, we find that the theory of the defense—*i. e.,* that the deceased came to her

death through being struck by a speeding automobile—is consistent with all of the surrounding facts and circumstances, whereas the theory of the People, supported only by the evidence of Schrigley, is not sustainable.

Upon a careful analysis of Schrigley's testimony we find it unworthy of belief and that it should be entirely disregarded. It is impeached by the direct testimony of Smith; by the testimony of the three boys who tried to arouse him at the time of the accident; it is impeached by his own conduct in maintaining silence under circumstances when a normal person would have spoken; it is impeached by the facts and circumstances surrounding the accident itself, and more strongly than otherwise by its own inherent impossibility. Smith testified to a conversation with Schrigley the morning after the accident, at which time Schrigley professed ignorance of the entire transaction. It is true that Schrigley denies this impeaching testimony, but his denial is of no more value than the rest of his story. His testimony is inconsistent with that of the three boys who came to the house after finding the body. They all said that they hammered on the door and the side of the house, "hollered," and that the dogs were barking. Had Schrigley just witnessed the startling events which he described from the witness stand he not only would not have been asleep but would have been very prompt to make his presence known. He not only did not make his presence known, but told a rather weak story about coming down to the door and learning that the parties had left before he got there. At this time there was considerable commotion in the neighborhood, yet he says he went back to bed and again for the third or fourth time fell soundly asleep. He is further impeached by the fact he said nothing about what he claimed to have seen when the blood was found on the pavement the next morning and everyone was talking about what had happened. It is impossible to imagine a person with normal mentality, who had seen the things

he claimed to have seen, remaining silent under these circumstances. Neither is it possible to believe that with this knowledge in his breast he remained silent for more than four months, while the coroner's inquest was being held, the preliminary hearings being had and a grand jury returning an indictment. He is again impeached by the surrounding circumstances. The condition of the body does not bear out his story of what he claims to have seen. More than all else, however, he is impeached by the impossibilities of the story he told.

The testimony of a witness may contain within itself its own impeachment. If it is contrary to the general knowledge and experience of mankind; if it contravenes the laws of nature and of science; if it is necessarily impossible under the circumstances narrated, neither court nor jury is required to give it credence and it may be disregarded. (*Podolski* v. *Stone*, 186 Ill. 540; *Kennard* v. *Curran*, 239 id. 122; *Kennedy* v. *Modern Woodmen*, 243 id. 560; *Mannen* v. *Norris*, 338 id. 322.) This court will take judicial notice of laws of science and of nature and of the universal experience of mankind. (*Hicks* v. *Silliman*, 93 Ill. 255.) The accurate plats and surveys in evidence show that Schrigley was in bed and asleep in an up-stairs room in a house which was approximately one-fifth of a mile from the scene of the accident. The events in question took place between 12:00 and 1:00 o'clock in the morning on a starlit but moonless night. This court can hardly fail to take notice of the fact that eyesight depends upon light; that human eyesight can penetrate but a few yards into the darkness of night, and that at a distance of a fifth of a mile under such circumstances nothing can be seen with any degree of certainty whatever; that human ears have their limitations, and that at such a great distance conversations cannot be overheard and individual words clearly distinguished. It must be borne in mind that this witness testified that he was sleeping in a room with

all of its windows closed; that there was a door opened into an adjoining room and that in the adjoining room the windows were closed, except that one was open three or four inches at the bottom. The conversations which he claimed to hear in detail and with exactness as to particular words, were heard by him, he said, while he was lying on his bed, propped up on one elbow, under the circumstances above set forth. His testimony was that he was a very good sleeper and that he was awakened by a shout at twenty-five minutes after 12:00. He then claimed that he saw the woman walking from the road up towards the gate in the lane. He then lay down and fell soundly asleep after having heard the conservation in which the defendant's name was mentioned; that he did not know how long, but that after he had been asleep a while he was awakened for the second time, when he claims to have witnessed the actual homicide; that he thought there had been a wreck on the hard road, but regardless of that fact lay down and again fell soundly asleep; that he was awakened for the third time by the pounding on the side of the house, by the dogs barking, etc., but did not get down-stairs soon enough to see anybody; that notwithstanding all of the previous excitement he again lay down and fell soundly asleep, hearing nothing more until the next morning, when he found out there had been what he considered to be a murder on the pavement. Many other points might be mentioned in connection with the testimony of this witness, but we feel this outline is sufficient to indicate the reasons why we consider it incapable of belief and have disregarded it.

It is apparent that the jury did not believe Schrigley's testimony or they would have found a verdict of murder instead of manslaughter. The circumstance of the defendant, a married man, out riding in the middle of the night with an unmarried girl probably reacted against him. Disregarding this prejudicial circumstance and reviewing the

record on its merits, we find that all of the credible evidence can be reconciled in a reasonable manner upon the theory that the deceased came to her death through being accidentally struck by an automobile, and that the record fails to show the existence of any *corpus delicti*.

The judgment will therefore be reversed.

*Judgment reversed.*