THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.*
TYRONE LOVE, Defendant-Appellant.

First District (5th Division)    No. 62816

Opinion filed January 13, 1977.

James J. Doherty, Public Defender, of Chicago (Andrew Kleczek and Keith
Spielfogel, Assistant Public Defenders, of counsel), for appellant.

Mr. PRESIDING JUSTICE SULLIVAN delivered the opinion of the
court:

After a bench trial, defendant was found guilty of the voluntary

manslaughter of his wife, Sharon. He was sentenced to three years probation, with the first year to be served under the work release program; however, because of a violation of the conditions of his probation, the sentence was subsequently changed to two to six years imprisonment. In this appeal, taken only from the judgment finding him guilty of voluntary manslaughter, defendant contends that it was not proven by competent medical evidence that his alleged acts caused Sharon's death and that the trial court further erred by considering incompetent evidence and by refusing requested trial continuances. However, because of the view we take of this case, we need only consider the reasonable doubt contention.

On December 11, 1972, during the course of an argument with Sharon, defendant struck and repeatedly kicked her. Thereafter, for a 24-hour period, she complained of vomiting and abdominal pain while seeking medical attention. On the afternoon of December 12, she underwent abdominal surgery, which resulted in the removal of her spleen, which was found to have been ruptured. She remained hospitalized until her death, primarily due to pneumonia, on December 29, 1972.

The testimony at trial revealed that Gloria Fly, a friend of Sharon's, called upon the Loves in their apartment on December 11, 1972. There, she heard Sharon ask defendant for a spoon of drugs for her. He told her he didn't know where to get any, and she became angry and called him names. A fight ensued, during which Gloria saw defendant strike Sharon on the shoulders, knocking her against a door and onto the floor. While Sharon was lying on the floor, defendant kicked her in the vagina and in an area of her back two inches above her right hip. He kicked her over a period of 10 to 15 minutes. He also hit her in the head with a record rack and dragged her into an adjoining room. At this point, Gloria picked up Sharon's child and took him to his aunt's apartment, which was located across the courtyard. Defendant also left the apartment.

Gloria returned half an hour later to find Sharon holding her stomach, crying, and vomiting a thick substance. Two friends of Sharon's arrived and took her to the emergency room of Billings Memorial Hospital, where she was examined and asked to remain, but she returned home with Gloria. During the next 2½ hours, Gloria observed her coughing, holding her stomach, and vomiting a thick substance. At 3 a.m. on December 12, 1972, Gloria called an ambulance, which took Sharon to Chicago Osteopathic Hospital. Gloria accompanied her and was present during the examination. She stated that Sharon screamed with pain when pressure was applied to her abdomen. Pills were given to her, which were regurgitated along with blood and a yellow vomit. She and Sharon again returned to the Love apartment.

On the morning of December 12, Sharon's mother visited the Love

apartment and observed her daughter holding her left side while walking in a bent-over rather than an upright manner. At 4 p.m. that day, her mother took her to Michael Reese Hospital. In the waiting room, Sharon regurgitated a greenish vomit and was doubled up in pain. The doctors operated immediately.

Doctor Harry Richter, a surgeon, testified that he supervised the care of decedent at Michael Reese Hospital and was present at her operation on December 12. Prior to this operation, his examination of her revealed evidence of progressive bleeding in her abdomen. Surgery revealed the source of the bleeding to be a torn and lacerated spleen, which they removed. Dr. Richter observed the spleen upon its removal and described it as looking like "an apple that's been cracked open." He stated that the condition of the spleen was the result of injury but that he could not identify the character of the injury. He described it as being like a military injury; i.e., a major abdominal injury which is caused by external force and which was many hours old at the time he first saw her. Decedent remained hospitalized until her death on December 29, 1972. During this period, she had two other operations—a tracheotomy on December 17, to ease her breathing, and exploratory surgery on December 29.

Doctor Richter stated that the cause of her death was a combination of pneumonia, edema, lung abscesses and post-operative complications. He considered pneumonia a common result of the type of surgery undergone by decedent. Furthermore, he testified that the original trauma which occurred prior to the first exploratory operation, had originated the whole sequence of events including the contraction of pneumonia. He could not, however, determine the exact date on which she developed pneumonia.

Doctor Alexander O. Custodio, a pathologist employed by the Coroner of Cook County, testified that he had performed an autopsy upon decedent on December 30, 1972. In the course of an internal examination, he found extensive bilateral bronchial pneumonia accompanied by two lung abscesses which were part of the pneumonia, mild peritonitis, and the absence of a spleen, which had been surgically removed. In his opinion, the cause of death was bronchial pneumonia. He stated that spleen surgery was of such trauma to her body that it could predispose her to the contraction of pneumonia. He did not know when she contracted pneumonia but stated that it could have been there for quite awhile, but not for a month. He could say with certainty only that she had it for a few days.

At trial, defendant and his brother, Ronald, both testified that they left the Love apartment at 4:30 p.m. on December 11, 1972, to go to the movies. They returned between 10 and 10:30 p.m., at which time Sharon requested that defendant obtain drugs for her. When he refused to do so,

she became angry, called him names, and threw a cup at him—a piece of which cut his hand. At this point, defendant slapped her in the face twice and left to spend the night at Ronald's apartment. Defendant denied he had kicked decedent and stated that he had not returned to his apartment until the morning of December 12. Ronald also denied that defendant had kicked decedent.

OPINION

■■ Defendant contends that the State failed to establish the causal connection between his acts and the death of his wife. It is his position that the State had the burden of establishing two essential elements in the chain of causation—(1) that his acts caused the removal of decedent's spleen; and (2) that the splenectomy caused the deceased to contract pneumonia. He argues that the failure to establish either link leaves a reasonable doubt as to his guilt. We agree. The State has the burden of proving all material and essential facts which constitute the crime, and this burden never shifts to the defense. (*People v. Weinstein* (1966), 35 Ill. 2d 467, 220 N.E.2d 432.) To sustain a conviction for manslaughter, the death and a criminal agency causing the death must be established beyond a reasonable doubt. (*People v. Bentley* (1934), 357 Ill. 82, 191 N.E. 230.) In Illinois, expert medical testimony is unnecessary to prove the cause of death where the facts proved are such that laymen of average intelligence, based upon their knowledge or experience, would understand the acts of defendant were the cause. (*Waller v. People* (1904), 209 Ill. 284, 70 N.E. 681; *People v. Davidson* (1967), 82 Ill. App. 2d 245, 225 N.E.2d 727. See *People v. Hanson* (1935), 359 Ill. 266, 194 N.E. 520.) However, where the evidence of causation is beyond the understanding of laymen, expert medical testimony must establish that defendant's illegal actions could have caused the death. See *People v. Benson* (1960), 19 Ill. 2d 50, 166 N.E.2d 80; *People v. Manske* (1948), 399 Ill. 176, 77 N.E.2d 164.

Initially, we note the record shows that pneumonia was the primary cause of decedent's death and, while there is some question as to when she contracted it, the medical testimony clearly establishes that pneumonia could result from a weakened condition following surgery. Although there is no medical testimony specifically relating her pneumonia to the surgery, Dr. Custodio testified that it was a postoperative complication, and his pathological report, introduced into evidence by the State, discloses his opinion that her death was caused by "extensive bilateral pneumonia, and mild peritonitis, due to exploratory laparotomy and splenectomy, due to traumatic ruptured spleen." It thus appears to us that the record as a whole supports causation between her pneumonia and the surgical removal of her spleen.

■■■ We believe, however, that the record leaves considerable doubt as to the agency which in fact caused the rupture of decedent's spleen. Although there is testimony that defendant knocked decedent to the floor, that he delivered a number of kicks to her body, that he dragged her about the apartment, that decedent shortly thereafter began vomiting and complaining of abdominal pain, and that within 24 hours she underwent surgery for a ruptured spleen, there is a lack of evidence as to whether the acts of defendant were of the type which could have produced the injury to her spleen. There is no specific testimony that defendant kicked her in the area of the spleen and, as a matter of fact, the only statement in that regard was from Gloria Fly, who said defendant kicked decedent in the area about two inches above the hip, on the right side; whereas, the testimony locates the spleen in the upper left quadrant of the abdominal cavity, directly under the diaphragm and in an area protected by the rib cage. Fly also stated that defendant kicked decedent several times over a period of 10 to 15 minutes, but she gave no indication of any other area of decedent's body that was kicked. Furthermore, neither doctor gave or was asked for an opinion, hypothetically or otherwise, as to whether the acts of defendant could have ruptured the spleen. We think it significant also that there was no testimony whatever as to any bruising of decedent's body to indicate the area in which she was kicked. Moreover, we think that the failure of Dr. Richter, who apparently was her treating physician, to record or testify to any bruising or other external evidence of trauma to her body, supports an inference that any kicking or trauma she may have received was delivered with slight force.

A court of review normally will not substitute its judgment for that of the trier of fact; however, where the proof is so unsatisfactory as to leave a reasonable doubt as to defendant's guilt, the judgment will be reversed. *People v. McCombs* (1968), 94 Ill. App. 2d 308, 236 N.E.2d 569.

Here, we believe that the question of causation between the acts of defendant and decedent's ruptured spleen was beyond the understanding of a lay person, which would include the trial judge, and that expert medical testimony was necessary to establish it. (See *Benson; Manske.*) In the absence of such medical testimony, we are of the opinion that the proof as to this essential element is so unsatisfactory that there is reasonable doubt as to defendant's guilt. In view thereof, we reverse the judgment of the trial court. See *McCombs.*

Reversed.

LORENZ and DOWNING, JJ., concur.