(No. 49364.

THE PEOPLE OF THE STATE OF ILLINOIS, Appellant,
v. TYRONE LOVE, Appellee.

*Opinion filed Jan. 20, 1978.—Rehearing denied March 30, 1978.*

William J. Scott, Attorney General, of Springfield, and Bernard Carey, State's Attorney, of Chicago (Jayne A. Carr, Donald B. Mackay, and Raymond J. McKoski, Assistant Attorneys General, and Laurence J. Bolon, Michael E. Shabat, and Lee T. Hettinger, Assistant State's Attorneys, of counsel), for the People.

James J. Doherty, Public Defender, of Chicago (Andrew J. Kleczek, Assistant Public Defender, and Keith Spielfogel, law student, of counsel), for appellee.

MR. JUSTICE MORAN delivered the opinion of the court:

Following a bench trial in the circuit court of Cook

County, defendant, Tyrone Love, was convicted of the voluntary manslaughter of his wife, Sharon. On appeal, the appellate court reversed the conviction on grounds that the State failed to establish beyond a reasonable doubt that the defendant's conduct caused the injury which contributed to his wife's ultimate death. (45 Ill. App. 3d 259.) This court granted the State leave to appeal.

Gloria Fly, an eyewitness to the fight, testified on behalf of the State. She stated that during the late afternoon of December 11, 1972, she visited defendant's wife at the Love apartment. While Ms. Fly was with Sharon in the kitchen, Sharon asked the defendant for a "spoon of drugs." Defendant refused and stated that he did not know where drugs could be obtained. At that, Sharon began to berate defendant and to call him names. She threw a glass cup at the defendant; the cup missed him, shattered against the door and cut the defendant. He cursed his wife and slapped her face. A fight ensued. Defendant hit Sharon on the shoulder with his fist, causing her to fall against the dining room doors and onto the floor. He then began to kick her. The witness indicated that the defendant drew his foot back slightly and administered kicks to his wife's right side in the area of the abdomen approximately two inches above the hip, and to her vaginal area. The witness estimated the defendant kicked his wife for a period of 10 to 15 minutes, during which time his wife cursed him and called out for help. At one point, she tried, unsuccessfully, to crawl away. She also attempted to hit the defendant with a record rack, but defendant took it away from her and hit her with it, cutting her on the side of the head. He grabbed her by the arm and hair and dragged her into the living room. At that point, the witness gathered up Sharon's two-year-old son and took the child across the courtyard to a relative's home. Defendant departed from the apartment, leaving his wife on the living room floor.

Approximately 30 to 60 minutes later, Ms. Fly returned to the Love apartment, where she found Sharon sitting in the kitchen, crying and holding her stomach. Sharon began to vomit a thick substance. About an hour later, Ms. Fly, with the assistance of others, took Sharon to Billings Hospital. The attending physician attempted to persuade Sharon to stay at the hospital but she refused. Ms. Fly testified that, upon their return to the apartment, Sharon continued to vomit and cough for approximately 2½ hours before being taken by ambulance to Osteopathic Hospital. As doctors there examined Sharon, she evidenced pain when pressure was applied to her abdomen. She regurgitated pills given her. Sometime subsequent to 3 a.m., Ms. Fly returned with Sharon to the Love apartment, and stayed with her through the early morning hours.

Sharon's mother, Leslie Edinburg, testified that she visited her daughter on the morning of December 12 and observed her daughter with a gash on the head, bent over, and holding her left side. Later that day, Ms. Edinburg returned and took Sharon to Michael Reese Hospital. While there, Sharon began vomiting a greenish fluid and was doubled up with pain. Doctors operated immediately. Ms. Edinburg stated that, prior to December 11, her daughter was in fine health.

Dr. Harry Richter, a surgeon, testified that he supervised the care of Sharon at the hospital and was present at her operation on December 12. Prior to this operation, his examination of Sharon revealed that she had suffered an injury, suggesting progessive internal bleeding in her abdomen. Surgery revealed the source of the bleeding to be a lacerated spleen which was surgically removed. Dr. Richter observed the spleen upon its removal and described it as looking like "an apple that's been cracked open." Dr. Richter did not recall any other signs of internal trauma. He stated that the condition of the spleen was the result of a traumatic injury, but could not identify

the character of the injury other than to describe it as being like a "military injury," *i.e.,* a major abdominal injury caused by an external force and one which was many hours old at the time it was first observed. Sharon remained hospitalized until her death on December 29, 1972. During this period, she had two other operations—a tracheotomy on December 17, to ease her breathing, and an exploratory surgery on December 29. Dr. Richter stated that the cause of Sharon's death was a combination of pneumonia, edema, lung abscesses, and post-operative complications. He considered pneumonia to be a common result following a splenectomy. He stated that the onset of the factors causing Sharon's death occurred prior to the first operation, but that, in his opinion, the original trauma had triggered the sequence of events which led to Sharon's death.

On cross-examination, Dr. Richter described the location of the spleen as being in the upper left quadrant of the abdominal cavity and noted that the spleen can be torn by broken ribs. Defense counsel inquired whether Sharon had any broken ribs, to which Dr. Richter responded that he did not personally know but understood that the X-ray report indicated that there were some broken ribs. On redirect examination by the State, Dr. Richter again indicated that he had no personal knowledge of broken ribs. When further questioned, he stated that he was told the X rays indicated three broken ribs. Defense counsel objected on grounds that the doctor's remarks were hearsay. The court overruled counsel's objection and held that the doctor could state what the X rays showed if, in fact, he relied on them in making his diagnosis. The X rays were not introduced into evidence, and no testimony was elicited by the State to indicate whether the doctor relied on that information in making his diagnosis.

Dr. Alexander O. Custodio, a pathologist employed by the coroner of Cook County, testified that he had

performed an autopsy upon the decedent on December 30, 1972. In the course of his internal examination, he found extensive bilateral pneumonia and mild peritonitis. Aside from the surgical removal of the spleen, Dr. Custodio did not notice any other signs of trauma. Pathologically, Dr. Custodio stated, surgery and pneumonia are separate entities, but, clinically speaking, they can be related in that surgery predisposes the patient to pneumonia. Dr. Custodio could not with any degree of certainty pinpoint when the decedent contracted pneumonia other than to state that she had had it a few days before her death. Dr. Custodio agreed that the decedent's death was caused by extensive bilateral pneumonia and mild peritonitis due to the exploratory laparotomy and splenectomy.

At trial, defendant testified that he and his brother, Ronald, left the Love apartment at 4:30 p.m. on December 11 to go to the movies. They returned to the apartment between 10 and 10:30 p.m., at which time Sharon requested that defendant obtain drugs for her. When he refused, Sharon threw an object at him. Defendant stated that he slapped her twice and left the apartment to spend the night at Ronald's. He denied that he kicked her. Defendant's brother testified, corroborating defendant's testimony as to the events of December 11. He, too, denied defendant kicked Sharon.

In reversing defendant's conviction, the appellate court held that inasmuch as there was no evidence to indicate that decedent was kicked or externally injured in the area of the spleen, the trier of fact was, as a matter of law, incapable of determining, without the assistance of medical testimony, whether the defendant's conduct caused the spleen to rupture.

The State contends that the appellate court erred in reversing defendant's conviction; that no additional medical testimony was required inasmuch as the evidence introduced at trial was more than sufficient to prove

beyond a reasonable doubt that defendant's conduct caused the decedent's spleen to rupture. The State concludes that the appellate court substituted its judgment for that of the trier of fact.

By cross-argument, the defendant contends that the State failed to prove beyond a reasonable doubt the causal relationship between the defendant's conduct and the pneumonia which ultimately led to Sharon's death. Defendant also asserts that the trial court erred in considering Dr. Richter's testimony concerning broken ribs. Due to the appellate court's view of the case, it did not reach the defendant's latter contention.

We find that the appellate court erred in reversing the defendant's conviction. The evidence at trial clearly established that decedent was severely beaten. The eyewitness testified that the defendant repeatedly administered kicks to the abdominal and vaginal regions for approximately 10 to 15 minutes. Although the witness indicated to the court that the kicks were administered to the right side of the abdomen, approximately two inches above the victim's hip, there was also testimony that the decedent demonstrated pain throughout her abdominal region. From Ms. Fly's description of the fight, it can be reasonably inferred that the defendant acted with a substantial amount of force, evidenced by his repeated kicking, his causing the decedent to fall against the dining room doors, his striking her over the head with the record rack, and his dragging her from one room to another by her hair and arm. Following the fight and until decedent's final admission to the hospital, she demonstrated abdominal pains and discomfort, vomiting and coughing. Decedent's mother testified that, prior to December 11, 1972, her daughter was in fine health. Dr. Richter testified that when he examined Sharon upon her arrival at Michael Reese Hospital, he found evidence suggesting progessive internal bleeding, that her stomach was exquisitely tender

to palpation, and that the ordinary, normal sounds of the abdomen were absent. Surgery revealed a lacerated, bleeding spleen. Dr. Richter indicated that the condition of the decedent's spleen was the result of a traumatic injury caused by an external force of some kind.

Defendant's contention that further medical testimony was required to establish causation between the defendant's act and the decedent's injury is unpersuasive. The medical evidence, as related above, clearly established the decedent's injury to be the result of an external force applied to the abdominal region. Apart from the defendant's conduct, there is no evidence of any other external force to the decedent's abdomen.

In cases where the evidence suggests one or more acts which might have caused the injury, some of which are disconnected from any act of the defendant, medical testimony may be necessary to assist the trier of fact in determining whether the defendant's act or course of conduct constituted a contributing factor. But when, as here, the evidence reasonably and sufficiently connects the defendant's acts to the victim's subsequent state of ill-being, and where there is no evidence suggesting an act or cause of injury apart from the defendant's conduct, further medical testimony is not required to establish that the defendant's acts were sufficient to cause the injury.

In *People v. Ransom* (1975), 33 Ill. App. 3d 503, a case factually analogous to that presented here, evidence at trial indicated that defendant twice struck the victim on the side of the head with a board. The victim walked away from the scene under his own power, but died several days later. The physician who performed the autopsy testified that the victim had a half-inch laceration in the back of the head and a three-inch laceration above the left eyebrow, both of which had been sutured. There were no signs of skull fracture, but he found a moderate subarachnoid hemorrhage and pneumonia in the right lung. The physi-

cian stated that the primary cause of death was traumatic subarachnoid hemorrhage and that the secondary cause of death was pneumonia. There, as here, no testimony was elicited from the physician as to whether the defendant's acts were sufficient to cause the injury observed. Though the appellate court did not address the issue presented here, it did hold that there was sufficient evidence from which it could be inferred that the defendant landed blows on the deceased's head and face and that the victim's death was caused by the beating administered to him by the defendant. (33 Ill. App. 3d 503, 505-06.) On appeal, this court agreed with that portion of the appellate court's opinion, holding there was sufficient evidence of causation, but reversed on other grounds. (*People v. Ransom* (1976), 65 Ill. 2d 339, 341.) In *Ransom,* as here, the only reasonable inference that could be drawn from the evidence is that the defendant's conduct constituted the external force which caused the injury received by the victim.

Defendant relies on *People v. Benson* (1960), 19 Ill. 2d 50, as authority for the proposition that additional medical testimony was necessary to prove causation. *Benson,* however, is distinguishable from the facts presented here. In *Benson,* the court held that there was insufficient evidence connecting defendant's sexual attack to the injury sustained to the victim's head and brain. The court noted that there was no convincing proof that the condition of the victim's head or brain was caused by force or trauma or that the defendant committed any bodily assault about the head. In essence, the court held that there was absolutely no evidence to connect the defendant's conduct with the injury which caused the victim's death. Here, unlike *Benson,* there was direct testimony that defendant administered a series of kicks to the deceased's abdomen and that the deceased thereafter experienced vomiting and indicated pain throughout the

abdominal region, culminating in the removal of a ruptured spleen. Considering the physician's testimony regarding the nature and cause of the injury and the lack of any evidence of record suggesting other possible traumatic external forces applied to the deceased's abdominal region, we do not believe the trier of fact was left to conjecture and speculation in determining whether defendant's acts caused the deceased's injury.

Defendant, in his brief, argues that the record suggests two alternative explanations for the ruptured spleen. He hypothesizes that decedent suffered from drug addiction and that this addiction resulted in an embolization of the spleen which caused it to rupture. He further hypothesizes that the deceased could have caused the injury to herself. As to the first of these contentions, there is no evidence that decedent was a drug addict, and, further, medical testimony indicated that the injury was caused by an external force, not by an internal disorder. With respect to defendant's second theory, there is no suggestion in the record to indicate that decedent caused the injury herself. On the contrary, evidence indicates that decedent was in the same state of ill-being from the time of the beating until the time of her admission to Michael Reese Hospital.

By way of cross-argument, defendant posits that the evidence was insufficient to establish the causal relationship between the splenectomy and the deceased's ultimate death caused mainly by pneumonia. With respect to this argument, the appellate court held, "[T]he record as a whole supports causation between [deceased's] pneumonia and the surgical removal of her spleen." (45 Ill. App. 3d 259, 262.) We concur in this conclusion. The record clearly establishes that the splenectomy predisposed the decedent to pneumonia. Although Dr. Richter stated that the combination of factors which resulted in Sharon's death existed prior to her first operation, he opined that the original trauma triggered the sequence of events which

ultimately led to her death. Dr. Custodio, too, related that the surgery would predispose the body to pneumonia, and he agreed that the cause of death was extensive bilateral pneumonia and mild peritonitis due to the exploratory laparotomy and the splenectomy. Defendant is liable for the decedent's death even though his acts are not the sole and immediate cause. (*People v. Reader* (1962), 26 Ill. 2d 210, 213; *People v. Meyers* (1945), 392 Ill. 355, 359-61.) Accordingly, we find that the State sufficiently proved that the defendant's conduct contributed to his wife's subsequent death.

Finally, defendant contends that the trial court committed reversible error when, without a proper foundation having been laid, it permitted Dr. Richter to state that he was told certain X rays showed the decedent suffered several broken ribs. Even assuming that the trial court erred in admitting this testimony, we find it was harmless error. In finding the defendant guilty, the trial court cited the broken ribs as but one of a number of cumulative facts which indicated the seriousness of the beating administered to the decedent. As noted above, there was ample evidence, other than that of which defendant complains, to support the finding. We find, therefore, that the trial court's consideration of this testimony was not reversible error. *People v. Murdock* (1971), 48 Ill. 2d 362, 366-67.

Accordingly, the judgment of the appellate court is reversed and the judgment of the circuit court is affirmed.

*Appellate court reversed;*
*circuit court affirmed.*