People of State of Illinois, Defendant in Error, v. Winfield W. Scott and Jack Zimmerman, Plaintiffs in Error.

Gen. Nos. 45,251, 45,258.

Opinion filed November 21, 1951. Rehearing denied December 5, 1951. Released for publication December 6, 1951.

HARRY A. BIOSSAT, of Chicago, for certain plaintiff in error; DARROW, SMITH & CARLIN, of Chicago, for certain other plaintiff in error; WILLIAM L. CARLIN, and LOUIS A. ROSENTHAL, both of Chicago, of counsel.

JOHN S. BOYLE, State's Attorney of Cook County, of Chicago, for defendant in error; JOHN T. GALLAGHER, RUDOLPH L. JANEGA, ARTHUR F. MANNING, JAMES A. BROWN, and SAMUEL PAPANEK, Assistant State's Attorneys, all of Chicago, of counsel.

MR. JUSTICE LEWE delivered the opinion of the court.

Plaintiffs in error Winfield W. Scott and Jack Zimmerman, hereinafter called defendants, and Sidney Greenberg, were indicted for conspiracy to cause a criminal abortion on Octavia Owsley. The trial court granted a severance as to Greenberg. A jury trial resulted in a verdict of guilty against defendants Scott and Zimmerman, fixing the punishment of each at one year in the county jail and a fine of $1,000. Defendants' motion for a new trial and in arrest of judgment were overruled and judgment was entered accordingly.

Octavia Owsley was the People's principal witness. Her testimony is substantially as follows. In September, 1948, Miss Owsley became acquainted with Greenberg, a police officer of the City of Chicago. Thereafter she had sexual relations with Greenberg. Some time

between March 15 and April 15, 1949, Miss Owsley told Greenberg that she thought she was pregnant. About May 4, 1949, at Miss Owsley's direction, Greenberg took her to Dr. Victor Pacyna, who examined her. Dr. Pacyna told Miss Owsley that he thought she was pregnant "but he wasn't sure," and recommended that she have a "rabbit test" made at a hospital. Miss Owsley admitted that she did not have the test made. Greenberg suggested to Miss Owsley that she be aborted. He told her that he had talked to defendant Zimmerman about it. Zimmerman, a chiropodist, had been treating Greenberg for a foot ailment.

Early in June 1949, accompanied by Greenberg, she went to the office of Zimmerman, where he examined her and afterwards told her that he had arranged with defendant Scott, a physician, to perform an abortion for $250. June 3 she went to Scott's office, accompanied by Greenberg and Zimmerman, where Dr. Scott performed the abortion and was paid the agreed sum of $250.

Greenberg and Miss Owsley lived together in an apartment leased by Greenberg, from June 3, 1949 to June 27, when she had a quarrel with Greenberg. On that day he gave her ten dollars and drove her to the Greyhound Bus Depot, intending that she return to her home in Kentucky. Instead of going to Kentucky she went to a nearby police station and related the details of the alleged abortion to a police officer who sent her to the State's Attorney's office. After interviewing an assistant State's Attorney Miss Owsley was placed in the protective custody of a policewoman at her home until October 7, 1949 when she ran away and contacted Greenberg. She told Greenberg she was destitute and needed money for clothing and transportation and that she wanted to leave Chicago. Shortly thereafter she lived with Greenberg as husband and wife under an assumed name (Jack Sheppard and

wife) in a hotel in the town of Cicero. While residing there Greenberg and Miss Owsley conceived the idea of getting money from Dr. Scott. Miss Owsley also testified that Greenberg suggested that she ask defendant Scott for $5,000; that Greenberg contacted Scott who came to Cicero on August 7th and gave her $200 and at that time agreed to give her the additional sum of $3,000 on August 9 in Gary, Indiana. On August 9 Scott met her at Gary where he gave her the sum of $3,000. While visiting Gary she resided with Greenberg at a hotel where they were registered as Mr. and Mrs. Joe Longo. On that occasion the money paid to her by Dr. Scott was turned over to Greenberg who rented a safe deposit box at a bank in Gary, Indiana. After leaving Gary she and Greenberg made short automobile trips to Michigan and Wisconsin and thereafter she traveled alone to New York and Miami, Florida.

Dr. Pacyna, called as a witness by the People, testified that his examination of Miss Owsley led him "to suspect pregnancy," that he recommended she have an Ascheim-Zondek test made at the Roosevelt Hospital, and that so far as he knew she never had the test made.

For the purpose of corroborating the testimony of Miss Owsley, the People called three witnesses, Edward Elkins, a hotel clerk at Gary, Indiana, Marie Miller, a hotel clerk in Cicero, and Dolores Reece, a bank clerk in charge of the safety vault. Elkins and Miller both testified that the registers of their respective hotels showed the registration of guests in the names Miss Owsley said she and Greenberg used when they lived at these hotels, and Dolores Reece testified that a person named Greenberg rented a safety deposit box at a bank in Gary. None of these witnesses stated that they knew Miss Owsley or Greenberg or remembered them being present at the time Miss

Owsley said she was residing at Cicero and Gary, nor is there any testimony tending to prove that either of the defendants appeared at Cicero and Gary at any time, except that of Miss Owsley.

Dr. Scott testified that he had practiced as a physician and surgeon in the City of Chicago since 1937 and was a member of the Chicago and Illinois Medical Societies; that he had known defendant Zimmerman since 1940; that on June 3, 1949 he examined Miss Owsley at his office; that Miss Owsley told him that she ''believed she might be pregnant''; that he asked Miss Owsley if she had been pregnant before and that she told him that she had a baby born about thirteen months before. Dr. Scott further testified that after examining Miss Owsley he could not determine pregnancy and asked her to return with a specimen of urine for the purpose of making an Ascheim-Zondek test; that he charged her five dollars for the examination; that Miss Owsley never returned for the test, and that in his opinion Miss Owsley was not pregnant.

Dr. Scott denied committing an abortion upon Miss Owsley and receiving the sum of $250 from Zimmerman. He also denied meeting Miss Owsley and Greenberg in Cicero or Gary and stated that he never saw Miss Owsley after June 3, 1949 until her appearance in the courtroom at the time of the trial; that Miss Owsley came to his office unaccompanied by anyone; and that no one was present when she was examined. The witness also testified that he left his home about four o'clock on the afternoon of August 6, 1949 for his father's farm located at Pittsfield, Illinois, and remained there until August 10th. Dr. Scott's testimony that he was out of the city on August 7th, when Miss Owsley claims she met him in Cicero, was corroborated by his father and mother who operate a farm near Pittsfield, Illinois, and his sister-in-law, Mrs. Bash, who lived at Dr. Scott's home.

77

Defendant Zimmerman testified that he knew Greenberg two or three years but did not know he was a police officer because he was always dressed in civilian clothes; that Greenberg came to his office the latter part of January or early February and again in the early part of June of 1949; that at the latter visit, at Greenberg's request, Dr. Zimmerman called Dr. Scott for the purpose of having Dr. Scott examine Miss Owsley in order to determine whether she was pregnant; that he did not examine Miss Owsley; and that she was in his office but once. Defendant Zimmerman also testified that he had never discussed an abortion with Greenberg, and denied accompanying Miss Owsley and Greenberg to Dr. Scott's office on June 3rd, 1949 and stated that he never went with them to Cicero, and that the only money he had ever received from him was for services performed in treating Greenberg for a foot ailment.

Esther Bash, a sister-in-law of Dr. Scott, testified that she lived with her husband at the home of Dr. Scott; that on August 7, 1949 she received a telephone call from someone known as Greenberg whom she had never met before, inquiring about the whereabouts of Dr. Scott; that she told this person that Dr. Scott was at his parents' farm at Pittsfield, Illinois; that during the telephone conversation this person said to her, "I have got to see Dr. Scott. I have a crazy girl who wants five thousand dollars." That she accompanied her husband to Cicero where by prearrangement she met Greenberg whom she was able to identify because of his wearing apparel which had been described to the witness during the telephone conversation. After listening to Greenberg's demands in behalf of Miss Owsley the witness told Greenberg, "I will have the Doctor get in touch with you when he gets back in town." That she communicated with Dr. Scott at Pittsfield on August 7th and related the coversation

78

with Greenberg; that Dr. Scott returned to Chicago late in the evening on August 10th, 1949. The witness further testified that she knew some people had been trying to blackmail Dr. Scott and that she drove to Cicero to ascertain whether this person (Greenberg) had called her for that purpose.

Character witnesses testified in behalf of both defendants.

The record shows that at the trial when Miss Owsley was first called as a witness by the People she testified in substance that she went to the office of the defendant Zimmerman with Greenberg who was having his foot treated; that that was the last time she saw Zimmerman; that she never saw defendant Scott at any time; and that she was never at his office. Thereupon, a conference was held outside of the presence of the jury between defendants' counsel and the State's Attorney. The State's Attorney told the court that the State was taken by surprise; that Miss Owsley had made contrary statements in the State's Attorney's office on many occasions, and asked for leave to cross-examine her. Over the objections of defendants the court permitted the State's Attorney to examine Miss Owsley. She was asked if she had testified before the grand jury of Cook county and also whether certain questions were propounded to her at that time and if she had given answers to them. She refused to answer these questions on the ground that the answers might incriminate her. When Miss Owsley persisted in her refusal to answer the questions the trial judge announced that he was going to hold her in contempt of court and sentence her to six months in the county jail. At the court's direction she was taken into custody by the sheriff and confined to the county jail for the night. No order of commitment had been entered by the trial court. On the following morning, in the presence of defendants and Miss Owsley, the trial

judge asked the State's Attorney if he had prepared a formal written order committing her to the county jail for six months for contempt. At that time Miss Owsley recanted, the jury was recalled, and she testified as heretofore related about the details of the alleged abortion performed by defendant Scott which implicated defendant Zimmerman.

■■ Defendants have assigned numerous errors as grounds for reversal. The basic question presented is whether there is sufficient credible evidence to remove all reasonable doubt of the defendants' guilt. In *People v. Sheppard,* 402 Ill. 347, the Supreme Court said at page 351 that "in criminal cases it is the duty of the court to review the evidence, and if, there is not sufficient credible evidence, if it is improbable or unsatisfactory or not sufficient to remove all reasonable doubt of defendant's guilt and create an abiding conviction that he is guilty, the conviction will be reversed." To the same effect see *People v. Willson,* 401 Ill. 68; *People v. Holt,* 398 Ill. 606. And in *People v. Bradley,* 375 Ill. 182, the court held at page 185, "It is the duty of the court and jury to resolve all of the facts and circumstances in evidence on the theory of innocence, rather than guilt, if that reasonably may be done, and where the entire record leaves us, as this one does, with a grave and substantial doubt of the guilt of the defendant, we will reverse the judgment." (Citing *People v. Dewachter,* 353 Ill. 266; *People v. Logan,* 358 Ill. 64.)

In the instant case the conviction of defendants rests almost entirely upon the testimony of Miss Owsley. The trial court permitted her to testify to many conversations alleged to have taken place between Greenberg and the defendants out of her presence. Greenberg, her admitted paramour and co-conspirator, did not testify. The record shows that Miss Owsley made

many self-contradictory statements. She admitted on cross-examination that she lied on several occasions; she made conflicting statements as to her last menstrual period before the alleged abortion, and about her visits to Dr. Scott's office. Miss Owsley also admitted that several months before meeting Greenberg she had a baby born out of wedlock at a Salvation Army home. Her recantation came after she had spent a night in jail and was threatened with further incarceration for a period of six months for contempt of court. There is no doubt that she tried to shield her paramour, Greenberg. She stated that she told a member of the State's Attorney's staff that she "wouldn't testify because of my love for Sidney Greenberg."

█ The testimony of a witness may contain within itself its own impeachment, and he may be contradicted by what he states as well as by adverse testimony, and there may be omissions, discrepancies, and improbabilities in his testimony as to justify a court or jury in disregarding it in its entirety. (*Hadley v. White,* 367 Ill. 406; *People v. Bentley,* 357 Ill. 82.)

█ We have made a careful examination of the record consisting of more than a thousand pages. In considering the probative value of Miss Owsley's testimony in the light of the facts and circumstances shown by the record we are of the opinion that her testimony is not sufficient to remove a reasonable doubt of defendants' guilt and create an abiding conviction that they are guilty. Application of the tests announced by our Supreme Court in *People v. Sheppard,* 402 Ill. 347, and *People v. Bradley,* 375 Ill. 182, and the other cases last cited to evidence in this case impels us to reverse the judgment against the defendants.

In the view which we take of this case it is unnecessary to consider the other points raised by the defendants.

For the reasons given, the judgment as to each defendant is reversed.

*Judgment as to each defendant reversed.*

KILEY, P. J. and FEINBERG, J., concur.