STATE, Respondent, *v.* DONGES, et al., Appellants.

No. 9226.

Submitted November 25, 1952. Decided December 12, 1952.

251 Pac. (2d) 254.

Hugh J. Lemire, Miles City, for appellant.

Arnold H. Olsen, Atty. Gen. and Vera Jean Heckathorn, Asst. Atty. Gen., Bruce M. Brown, County Atty., Miles City, for respondent.

Mr. Lemire and Mr. Brown argued orally.

MR. JUSTICE FREEBOURN:

By information filed November 26, 1951, Evelyn Donges and Tom LaFave were accused by the county attorney of Custer county of the crime of murder. The information, in part, charged that on September 11, 1951, the defendants committed such murder "in the perpetration of robbery" and that they "with intent to commit robbery" made "an assault upon one John Hoffman" and did by force and violence "seize and rob and take away from the person and against the will of the said John Hoffman lawful money of the United States in excess of the sum of Forty Dollars ($40.00)," and that in the perpetration of such robbery the defendants killed and murdered said John Hoffman.

Defendants, tried jointly, were on December 12, 1951, found guilty by a jury of murder in the first degree. Punishment being left to the court, the defendants were by the court sentenced to life imprisonment in the state prison.

Motion for new trial was denied and defendants have appealed to this court.

Two specifications of error are urged by appellants: (1) That error was committed by the trial court in the giving of the court's instructions No. 28 and No. 29; and (2) that the verdict is contrary to the evidence and for that reason a new trial should have been granted in the lower court.

The record shows that upon settlement of instructions by the trial judge, instructions No. 28 and No. 29, as finally proposed to be given, were not objected to by counsel for appellants. No error in the giving of such instructions was assigned, specifically pointed out or excepted to.

Appellants' counsel were two lawyers with years of experience in trial work, ranking high among the members of the bar of this state as to ability and integrity. They gave defendants a good defense. In this situation no reason exists why the statutes and law applicable to instructions given without objection should not here apply.

The district court by statute was expressly forbidden to grant a new trial and this court is forbidden to reverse the cause, even if error existed in such instructions, where no objections were made to their giving.

R. C. M. 1947, sec. 94-7201, subd. 4, in part provides: "On such settlement of the instructions the respective counsel, or the parties, shall specify and state the particular ground on which the instruction is objected or excepted to, and it shall not be sufficient in stating the ground of such objection or exception to state generally that the instruction does not state the law, or is against law, but such ground of objection or exception shall specify particularly wherein the instruction is insufficient, or does not state the law, or what particular clause therein is objected to. * * * No motion for new trial on the ground of errors in the instructions given shall be granted by the district court unless the error so assigned was specifically pointed out and excepted to at the settlement of the instructions, as herein provided; and no cause shall be reversed by the supreme court for any error in instructions which was not specifically pointed out and excepted to at the settlement of the instructions herein specified, and such error and exception incorporated in and settled in the bill of. exceptions, as herein provided."

In State v. Chronopoulos, 60 Mont. 329, 199 Pac. 266, wherein the defendant, charged with murder, was convicted and given the extreme penalty, this court said: "The record, however, discloses that at the time the instructions of which complaint is made were offered the court expressly asked the defendant if he had any objections to them, and defendant, unequivocally, by his attorney, replied that he did not. As no objections were

made to the giving of these instructions, this court has no authority to review them. Rev. Codes, sec. 9271 [1907, now R. C. M. 1947, sec. 94-7201, supra]; State v. Hill, 46 Mont. 24, 31, 126 Pac. 41; State v. Fowler, 59 Mont. [346], 196 Pac. 992 [197 Pac. 847].'' See also: State v. Thomas, 46 Mont. 468, 128 Pac. 588; State v. Brodock, 53 Mont. 463, 164 Pac. 658; State v. Evans, 60 Mont. 367, 199 Pac. 440; State v. Bolton, 65 Mont. 74, 212 Pac. 504; State v. Dougherty, 71 Mont. 265, 229 Pac. 735; State v. Sawyer, 71 Mont. 269, 229 Pac. 734; State v. Cassill, 71 Mont. 274, 229 Pac. 716; State v. Vallie, 82 Mont. 456, 268 Pac. 493.

However, because of the gravity of the charge and the youthfulness of the defendants, we pass upon the merits of the questioned instructions.

Instructions No. 28 and No. 29 are as follows:

''28. The jury are instructed that, if you believe from the evidence beyond a reasonable doubt that the defendants unlawfully inflicted upon the deceased a wound not necessarily fatal, but which might by timely and skillful medical care have been cured, and that the death of the deceased resulted probably because of the absence of such medical care, yet if no cause of death intervened other than the absence of such medical attention and care, the defendants are liable to the same extent as though death had resulted from the wounds immediately inflicted by them.

''29. You are instructed that where one unlawfully inflicts an injury upon another not in itself calculated to produce death and death results solely by the neglect of someone whose duty it is to see that the person so injured should receive medical attention or the failure of the person so injured to receive proper medical care or surgery, then such neglect or failure is a good defense to the charge of murder.''

The instructions are not conflicting. Each applies to a factual situation which the jury could have found to exist in the evidence. The jury could have found that Hoffman, approximately an hour after he had been struck down and robbed, was arrested

and jailed by the city police, and after remaining in jail all night was taken to the hospital about 8:00 o'clock the next morning, where he was operated upon about mid-day.

There was medical testimony to the effect that Hoffman, if taken to the hospital and operated upon when arrested, would have survived. Other medical testimony was to the effect that Hoffman would have died from his injuries no matter when operated upon. The operating surgeon testified: ''In my opinion he was doomed from the minute it happened whether he had been seen and operated on five minutes after it happened or five days after it happened. Q. The injury that you actually saw there was as you say the cause of death right there, and no amount of surgical operations or anything else could have saved him? A. That's right, that is my opinion.''

The jury could have found from the evidence that the failure of the police officers to take Hoffman to the hospital upon his arrest was neglect on their part and resulted in his death, or they could have found that even if he had been taken to the hospital by the officers at the time of his arrest he would have, nevertheless, died. On the other hand, the jury could have found that the police officers were not remiss in their duty to Hoffman, because they believed him only badly intoxicated and did not recognize he had been injured until the following morning. A number of witnesses, who saw Hoffman, after the assault and robbery and before his arrest, and who helped him from the street to the alley so that he might not be arrested, did not sense or appreciate that he was injured but believed him merely intoxicated.

26 Am. Jur., Homicide, sec. 51, pp. 193, 194, has this to say: ''It may now be regarded as a settled rule of law that one who inflicts an injury on another will be held responsible for his death, although it may appear that the deceased might have recovered if he had taken proper care of himself or submitted to a surgical operation; that unskilled or improper treatment aggravated the wound and contributed to the death, or that death was immediately caused by a surgical operation rendered

necessary by the condition of the wound. Negligence, mistake, or lack of skill on the part of an attending physician or surgeon affords no defense to a charge of homicide against the person inflicting the injury. The rule is founded upon the general principle that every person is to be held to contemplate, and to be responsible for, the natural consequences of his own acts. It may be said that neglect of the wound or its unskilful and improper treatment, which are of themselves consequences of the criminal act which might naturally follow in any case, must in law be deemed to have been among those consequences which were in contemplation of the guilty party, and for which he is to be held responsible. A different doctrine would tend to give immunity to crime, for, as has been pointed out, amid the conflicting theories of medical men and the uncertainties attendant upon the treatment of bodily ailments and injuries, it would be easy in many cases of homicide to raise a doubt as to the immediate cause of death and thereby to open a wide door by which guilty persons might escape conviction and punishment.

"Of course if it is established that the maltreatment of a wound not in itself mortal or dangerous, the medicine administered, or the deceased's own misconduct, and not the wound, is the whole cause of death, the person inflicting the wound will not be criminally responsible. There is some authority for the proposition that if a doubt exists as to the character of a wound, and as to whether death is the result thereof or of improper or negligent treatment, the person inflicting the wound will be absolved from responsibility."

The instructions were as favorable to the defendants as the law and facts warranted and no error was committed by the trial court in their giving.

A reading of the transcript shows that the evidence is sufficient to sustain the conviction.

Much of what counsel for appellants urge as reasons why the evidence is insufficient constitutes a good argument to a jury but gives this court no legal cause for reversing the case and directing a new trial.

Ira Bungard, 15 years of age and an accomplice of the defendants, testified for the state. Standing alone little credence would be given his testimony because of the many contradictions in a number of different statements he had made. If no contradictions existed in his several statements and they had all been the same, still standing alone, his testimony would have little value in the eyes of the law, for R. C. M. 1947, sec. 94-7220, provides: "A conviction cannot be had on the testimony of an accomplice, unless he is corroborated by other evidence, which in itself, and without the aid of the testimony of the accomplice, tends to connect the defendant with the commission of the offense; and the corroboration is not sufficient, if it merely shows the commission of the offense, or the circumstances thereof."

However, the jury were justified in believing any part of Bungard's testimony which was corroborated by other independent evidence.

The evidence which corroborated Bungard could be furnished by the defendants. It could be circumstantial. It need not extend to every fact to which Bungard testified and need not be sufficient to justify a conviction or establish a prima facie case of guilt; it being sufficient if it tends to connect defendants with the commission of the crime. Whether it tends to do so is a question of law, while its weight—its efficacy to fortify the testimony of Bungard and render his story trustworthy—is a matter for the consideration of the jury. State v. Cobb, 76 Mont. 89, 245 Pac. 265.

The jury could have found from his testimony: That he and defendant LaFave on September 11, 1951, in Miles City, discussed "rolling a guy so we could get some money"; that "Evelyn told us to meet her at the Bison Cafe and she'd have somebody to roll"; that "she said, 'The first guy I bring out will be him' "; that while Bungard stood outside near the front door of the Bison Cafe, "Evelyn and another guy and Tommy" came out of the cafe; that "Evelyn and this man" walked together, "and Tommy and I walked behind them"; that while

walking LaFave said to Bungard, "This is the guy we are going to roll."

The "guy," Hoffman, a farmer 5′ 4″ in height and intoxicated, was by Evelyn lured into an alley where "Tommy hit him" in the back of the neck, and as Hoffman was falling Bungard "kicked him in the stomach." While the victim lay unconscious in the alley the two defendants and Bungard "went through his pockets" and took his money. A few hours later they were fleeing from Miles City in a stolen car, traveling "about 85" miles an hour.

A signed, typewritten confession of each defendant was introduced in evidence. They were made, as shown upon their face, after the defendants had been "fully advised of my constitutional rights." Whereupon each made a statement "of my own free will and volition, without any promises, persuasion, or duress, concerning my participation in the death of John Hoffman, occurring in Miles City, Montana, on or about September 11, 1951."

The confession of defendant Tommy LaFave, now 17 years of age, read in part: "While in the Bison Cafe Evelyn put the finger on a fellow in the cafe that had some money on him. Evelyn told us that she would lure him outside the Bison Cafe by telling him that she would take him to a better place and we could get his money. Evelyn got this man, John Hoffman, to go outside with her and to the rear of the cafe, adjacent to the Montgomery Ward parking lot. I hit him in the back and he fell down, then 'Bud' gave him the boots several times around the head. We then went through his pockets and got $58, which we split three ways."

The confession of defendant Evelyn Donges, now 17 years of age, who signed as Evelyn Williams, in part read: "I was in the Bison Cafe on September 11th around 6:00 P. M. when John Hoffman came from the bar and I saw that he was pretty well drunk. Thomas Edward LaFave and Ira 'Bud' Bungard came into the cafe and 'Bud' asked me if I would get the guy outside and we would roll him and I told him that I would

do it. I got the man to go outside with me and to the rear of the cafe, adjacent to the Montgomery Ward parking lot. Tom then hit him in the back and he went down. 'Bud' then kicked him several times around the neck and head. We all went through his pockets and 'Bud' got the billfold. There was over $50.00 in the billfold and we split the money three ways—I got almost $20.00.''

The confessions, signed before witnesses, were repudiated by the defendants, who at the trial denied assaulting and robbing Hoffman.

It was the right of the trial court to determine the admissibility of the confessions, and we think the trial court properly admitted them in evidence. State v. Sherman, 35 Mont. 512, 90 Pac. 981, 119 Am. St. Rep. 869; State v. Kacar, 74 Mont. 269, 240 Pac. 365; State v. Ludwick, 90 Mont. 41, 300 Pac. 558.

The hospital report of Hoffman's condition shows: ''Pre-operative Diagnosis: Severe intra-abdominal injury; probable massive hemorrhage; possible rupture of hollow viscus.'' Post-operative diagnosis: ''Extensive intraperitoneal lacerations/c, extensive lacerations of the retroperitoneal abdominal veins in the region of the portal vein and the vena cava.'' Also ''a small tear'' in the liver, and a laceration ''extended through the posterior peritoneum, through the pancreas and the vessels posterior to the pancreas were found to be hemorrhaging profusely.'' According to the operating doctor, ''The pancreas was torn completely across.'' The evidence was to the effect that ''a kick in the stomach * * * would be sufficient * * * to cause the damage'' or injury which brought about Hoffman's death.

Bungard's testimony was corroborated in part by Lillian Hirsch, a 16 year old girl, who, although taking no part in the assault and robbery of Hoffman, accompanied the defendants and Bungard on their flight from Miles City. She heard Evelyn Donges talking to Donny LaFave, a brother of Tommy, before the assault and robbery took place: ''So he said he had someone spotted down by the Bison Cafe and she said, we could roll him that night. * * * He said, 'He was drunk and was flashing

money.' * * * She said, 'We can roll him tonight.' '' Leaving Miles City in a car with Tommy, Evelyn and Bungard, she said the car traveled as fast as it could, and that ''there was talk about rolling somebody and Evelyn said, 'We should roll somebody when we get to Broadus,' and Tommy said, 'Like Shorty?' '' She said, ''Well, Evelyn talked about hitting someone and Tommy and Bungard didn't like the idea because they were afraid they'd kill someone.'' She detailed how they went to Belle Fourche, Deadwood, Gillette and Smithfield, where Bungard left the group. She related how they traveled through Utah, Colorado, Idaho, Texas, Oklahoma, Kansas and Wyoming, ending up in Colorado Springs where they landed in the toils of the law; how Evelyn stole a car in Gillette, changing the license plates from their first car to it; how they stole money from an oil station register in Salida, Colorado, and $100 from a safe in Texas; and how in Windsor Evelyn tried to induce her to become a prostitute.

Delores Pollock talked to Evelyn Donges about an hour before the crime was committed. Evelyn wanted Delores to go to Wyoming with her. Delores testified: ''Q. What did she tell you? A. That she was going to roll this guy for that much money and I told her if she was going that way that I didn't want to go.'' Between 7:00 and 7:30 o'clock of the same night Ruby Steimback, a waitress, saw Evelyn Donges and her intended victim, John Hoffman, who was intoxicated, talking together in the Bison Cafe.

After the offense had been committed, John Hoffman managed to move from the alley, where the defendants had left him unconscious to a sidewalk in close proximity to adjoining entrances of the rear door of the Bison bar and an upstairs rooming house. Persons who found him there did not appreciate that he was injured, but thinking him merely intoxicated and, so that the police would not see him and arrest him, helped him back into the alley from whence he had come. Some of these witnesses testified that when found upon the sidewalk, Hoffman

made a statement to this effect: "He sure kicked the s— out of me in there."

There was other testimony that at the hospital Hoffman was incoherent and "at one time" said "they beat me up and robbed me in a beer tavern and threw me out," and another time he said "they kept following me," and quoting, "they kept following me and we got by or near an alley and they came from all directions," and that somebody hit him from behind and he thinks there were three of them. The witness further said that the dying man said they had kicked him in the stomach.

The weight to be given Hoffman's words was a matter for the jury.

For the reasons stated the judgment of the district court is affirmed.

MR. CHIEF JUSTICE ADAIR and ASSOCIATE JUSTICES METCALF, BOTTOMLY and ANGSTMAN, concur.