406 A.2d 1275 (1979)
In the Matter of J. N., Jr., Appellant.
Leroy PARKER, Appellant,
v.
UNITED STATES, Appellee.
Nos. 10737, 12150.
District of Columbia Court of Appeals.
Argued May 10, 1977.[*]
Decided August 17, 1979.
Argued September 7, 1978.
Decided August 17, 1979.
Rehearings En Banc Granted and Opinion Vacated November 15, 1979.
*1278 Robert W. Michels, Washington, D. C., appointed by this court for appellant in No. 10737.
James C. McKay, Jr., Asst. Corp. Counsel, Washington, D. C., with whom John R. Risher, Jr., Corp. Counsel, Washington, D. C., at the time the case was briefed and argued, Louis P. Robbins, Principal Asst. Corp. Counsel, and Richard W. Barton, Asst. Corp. Counsel, Washington, D. C., were on the brief, for appellee in No. 10737.
Richard A. Rosen, Public Defender Service, Washington, D. C., for appellant in No. 12150. Silas Wasserstrom, Public Defender Service, Washington, D. C., entered an appearance for appellant in No. 12150.
William J. Cassidy, Jr., Asst. U. S. Atty., Washington, D. C., with whom Earl J. Silbert, U. S. Atty., at the time the case was briefed and argued, John A. Terry and William J. Hardy, Asst. U. S. Attys., Washington, D. C., were on the brief, for appellee in No. 12150.
Before NEWMAN, Chief Judge, and KERN and NEBEKER, Associate Judges.
No. 10737, Argued May 10, 1977.
No. 12150, Argued September 7, 1978.
NEBEKER, Associate Judge:
Although these two cases arose from the same occurrence they were tried and were appealed separately. They are here consolidated for disposition. As each defendant raises different issues on appeal, we meet the concerns of each in sequence.

APPELLANT PARKER
Following a jury trial, the defendant was adjudged guilty of murder in the second degree under D.C.Code 1973, § 22-2401. He seeks a new trial on the ground that the trial judge failed to instruct the jury (1) that, if it concluded that a doctor's termination of the victim's life support system constituted willful or intentional malpractice or was an "abnormal" response to the victim's condition, it should find the defendant not guilty; and (2) that, if it found that the victim would have lived for more than a year and a day but for the termination of the life support system, it should find the defendant not guilty. We affirm.

I
On January 13, 1976, the appellant and three others attempted to snatch a purse from an 85-year-old woman. When the appellant latched onto the purse, the victim recoiled, whereupon she was struck from behind by one of the appellant's companions. The blow caused the victim to fall forward to the sidewalk. The band fled without the purse. A bystander found the injured woman conscious and able to talk. By the time the police arrived, she was unable to respond and an ambulance carried her to a hospital. There she was administered to by a resident and thereafter by a neurosurgeon. Upon arrival at the hospital the victim was able to talk. Her condition, however, quickly degenerated to where she could neither speak nor respond to verbal commands. After 24 hours in the hospital, she exhibited only primitive reflexes to stimuli. She failed to improve. Six days later, on January 19, on the basis of the patient's condition and her age, after consultation with other physicians involved in the case and upon agreement by the victim's son, the neurosurgeon discontinued all *1279 "heroic measures."[1] The woman died fifteen to twenty minutes later.

II
The trial judge properly refused to instruct the jury on the defense's theory that discontinuing the "heroic measures" may have constituted an "intervening cause" of death[2] so as to insulate the defendant from homicide liability. Although no specific instruction was requested,[3] the defendant suggests in his brief that the court could have properly instructed the jury as follows:
If you find that the Government has proved beyond a reasonable doubt all the other elements of the offense and that the defendant caused [the victim's] death, it is your duty to find the defendant guilty of murder. If, on the other hand, you find that the Government has failed to prove beyond a reasonable doubt that the defendant caused [the victim's] death because the actions of [the physician] constituted intentional or willful malpractice or were an abnormal response to the situation caused by the defendant's acts, then you must find the defendant not guilty of murder. [Emphasis added.]
For such an instruction to have been proper, evidence must have been presented (1) to resolve the issue of what constitutes "intentional *1280 or willful malpractice" or an "abnormal response," and (2) to demonstrate that the actions of the attending physician breached that standard. E. g., Haven v. Randolph, 161 U.S.App.D.C. 150, 152, 494 F.2d 1069, 1070 (1974) (per curiam) (prima facie case established by evidence of standard and breach).[4] In this case, there is no evidentiary basis for the kind of instruction now proposed.
The situation is analogous to a tort claim for medical malpractice. With one exception, a jury is permitted to find a physician liable in tort for malpractice only when the standard of care has been established by expert testimony. E. g., Harris v. Cafritz Memorial Hospital, D.C.App., 364 A.2d 135 (1976); Robbins v. Footer, 179 U.S.App.D.C. 389, 392-93, 553 F.2d 123, 126-27 (1977). The exception to the rule is:
Where laymen can say, as a matter of common knowledge and observation, that the type of harm would not ordinarily occur in the absence of negligence, the jury is allowed to infer negligence without expert testimony being presented. Haven v. Randolph, 161 U.S.App.D.C. 150, 151, 494 F.2d 1069, 1070 (1974); Prosser, The Law of Torts . . . 227. [Harris v. Cafritz Memorial Hospital, supra at 137 (emphasis added) (footnote omitted).]
See People v. Love, 45 Ill.App.3d 259, 3 Ill.Dec. 874, 876, 359 N.E.2d 733 (1977) ("where the evidence of causation is beyond the understanding of laymen, expert testimony must establish . . . the [cause of] death"), rev'd, 71 Ill.2d 74, 15 Ill.Dec. 628, 373 N.E.2d 1312 (1978) (evidence of causation sufficient without further expert medical testimony); State v. Brandt, 467 S.W.2d 948 (Mo.1971) (expert unnecessary where, from evidence, reasonable persons "of average intelligence would know from [their] own experience or knowledge that the wound was mortal in character," but expert testimony is necessary "where the cause of death is obscure and an average layman could have no well grounded opinion as to cause"); see also D. C. v. Barriteau, D.C.App., 399 A.2d 563 (1979) (expert testimony regarding economic loss). We will examine first the facts as they apply to the exception and then as they apply to the rule.
The medical conduct here involved does not, "as a matter of common knowledge and observation," constitute the requisite malpractice. The exception applies only where "a physician has committed a blunder so egregious that a layman is capable of comprehending its enormity. An example is the case of a surgeon who leaves a sponge in an incision after the removal of a kidney." Haven v. Randolph, supra 161 U.S.App.D.C. at 152, 494 F.2d at 1070, citing Rodgers v. Lawson, 83 U.S.App.D.C. 281, 284-85, 170 F.2d 157, 160-61 (1948). On facts quite similar to those here, however, an Illinois intermediate appellate court recently ruled that a physician's discontinuance of heroic measures was "reasonable" medical care.
Defendant's contention that the evidence failed to prove beyond a reasonable doubt that the victim died of the wounds from the gunshot is without merit. When the victim was brought to the hospital, his pulse was minimal. The neurosurgeon who examined him testified that the bullet had damaged a major portion of his brain and that he then exhibited many signs of death. The doctor's decision to withdraw life support measures was reasonable. *1281 [People v. Olson, 60 Ill.App.3d 535, 538, 18 Ill.Dec. 218, 222, 377 N.E.2d 371, 374-75 (1978).]
We need not hold that the doctor's actions were reasonable because that issue is not before us. It appears clear, however, that they were not so unreasonable, as a matter of common knowledge, as to be grossly negligent or worse.
The legal and medical authorities, cited in the briefs, confirm the conclusion that the facts here do not fall within the exception to the requirement of expert testimony. The government, on one hand, cites authorities to support the proposition that the neurosurgeon's action was reasonable as a matter of law. The defense, on the other hand, quotes from authorities holding the position that it is per se unreasonable for doctors, after consulting with a patient's family, to discontinue artificial life support measures. The lack of consensus among the cited authorities undermines the conclusion that the physician's actions here constituted gross malpractice as a matter of common knowledge.
Consideration of a series of articles in the New England Journal of Medicine also leads to this conclusion. In one article, the Critical Care Committee of the Massachusetts General Hospital reported on the "Optimum Care for Hopelessly Ill Patients." 295 New Eng.J.Med. 362 (1976). The Committee recommended to the hospital the use of a system by which critically ill patients are placed in one of four classes as follows:
1. Whenever appropriate, critically ill patients should be classified according to the following system.
Class A Maximal therapeutic effort without reservation.
Class B Maximal therapeutic effort without reservation but with daily evaluation because probability of survival is questionable.
Class C Selective limitation of therapeutic measures. The criterion which determines every aspect of the therapeutic regimen continues to be the overall welfare of the patient. At this time certain procedures may cease to be justifiable and become contraindicated. Particular attention must be given to resuscitation measures of all kinds. The therapeutic plan must be clearly detailed to the other members of the care team so that all understand and are united about their caring efforts and responsibilities. As an integral part of caring for the patient, approximate notes specifically describing the therapeutic plan should be made in the patient's record. The patient's resuscitation status should be similarly recorded in conformance with the policy governing orders limiting full cardiopulmonary resuscitation.
A Class C Patient is not an appropriate candidate for admission to an Intensive Care Unit. A decision to transfer the patient out of the Intensive Care Unit is based upon the needs of the patient, and transfer is appropriate only after required comfort measures become manageable in a nonintensive care setting. Whatever the patient's location, however, and irrespective of the specific therapeutic measures that have been selectively limited, a Class C patient and his family require and must be given full general support.
Class D All therapy can be discontinued.

Any measures which are indicated to insure maximum comfort of the patient may be continued or instituted.
According to the Committee, "[a]lthough Class C designation implies that death is the probable outcome, it may not necessarily be the case. With improvement, the patient's category may be changed to a more optimistic one." Id. at 363. As to Class D patients, the Committee writes:
The definite act of commission, such as turning off a mechanical ventilator, is to be performed only by an appropriate physician after consultation with and concurrence of the family and appropriate hospital committee (or committees) where indicated. Assignment to Class D is generally reserved for patients with brain death, or when there is no reasonable possibility that the patient will return to *1282 a cognitive and sapient life. [Id. (emphasis added).]
The committee's recommendation aligns with our determination that the neurosurgeon's disconnecting the respirator did not, as a matter of common knowledge, constitute gross negligence or an abnormal response to the patient's situation. The neurosurgeon testified at trial that the victim could never return to a cognitive and sapient life. He also consulted with and received the concurrence of the victim's family, which practice corresponds to the Committee's recommendation. Thus, the exception to the general requirement, that expert testimony is required to establish a standard by which a jury may determine malpractice or intentional malpractice, is not available here.
Mr. Parker confesses the propriety of terminating heroic measures for a person when a court-appointed guardian requests termination, see, e. g., In re Quinlan, 70 N.J. 10, 355 A.2d 647 (1976), but states that without court intervention, the action is never reasonable. We reject that argument. No legal authority is cited or appears to exist that requires the courts to intervene when extraordinary life support methods are threatened with withdrawal pursuant to a so called "living will" or as done here. See, e. g., In re Dinnerstein, ___ Mass.App. ___, 380 N.E.2d 134 (1978) (decision not to resuscitate not for the judiciary, but one "peculiarly within the competence of the medical profession"; "validity of order [not to resuscitate] does not depend on prior judicial approval"). The attending physicians and the family of the victim owe no duty to the defendant to treat the victim so as to mitigate the defendant's criminal liability. The defendant's desire to mitigate his liability may never legally override, in whole, or in part, the decisions of the physicians and the family regarding the treatment of the victim.
Turning now to the general rule that expert testimony is necessary to establish malpractice, (here, willful and intentional malpractice[5]), a review of the expert testimony at trial discloses no standard against which the jury could have determined that the neurosurgeon committed malpractice. The defense had the obligation to attempt to establish the standard by its own experts or by the government's experts. In this case, it attempted the latter. The government's experts, however, never intimated that the termination of heroic measures amounted to malpractice, much less willful or intentional malpractice. Indeed, it appears from the record that no expert testified concerning intentional or willful malpractice. At page two of its reply brief, appellant attempted to refute this line of logic:
Appellee seems to suggest that appellant would only have been entitled to the requested instruction had he introduced expert evidence at trial attacking Dr. Dennis' actions and furthermore that appellant was citing medical and legal authorities in his appellate brief in a vain attempt to supply the evidentiary basis for the requested instruction which was lacking at trial. (Brief for Appellee, at p. 24). To the contrary, these authorities were cited solely to demonstrate that on the basis of the evidence presented by the government at appellant's trial, and with nothing more, the jury could reasonably have found that Dr. Dennis' actions were a superseding cause and therefore appellant was entitled to an instruction on this issue. [Emphasis added.]
The defense thus contends, contrary to law as explained above, that no testimony, other than the facts of the physician's action of disconnecting the respirator, would have been necessary to support a verdict based on "superseding cause." Implicit in this argument is the concession that no expert testimony went to establish that the terminating action was anything but reasonable. Consequently, there being no evidentiary predicate for the instruction now proposed, *1283 we are unable to conclude that error warranting reversal has been demonstrated. See Wright v. State, Del., 374 A.2d 824, 829 (1977) (expert testimony generally required in homicide prosecution for causation defense based on unskilled treatment by attending physician).

III
The trial court did not err in failing to instruct the jury as follows:
If you find that with medical care [the victim] would have survived a year and a day, then you may not find him guilty of murder. But if you don't find that she wouldn't [sic] survive for a year and a day, then you may.
The year and a day rule is in force in the District of Columbia, having been adopted under D.C.Code 1973, § 49-301, from the common law. See State v. Brown, 21 Md. App. 91, 318 A.2d 257 (Ct.Spec.App.1974) (year and a day rule, as part of the common law of England, adopted by Maryland in 1776; see also Louisville, Evansville and St. Louis R.R. v. Clarke, 152 U.S. 230, 239, 14 S.Ct. 579, 581, 38 L.Ed. 422 (1894) (year and a day rule is in force "in this country" unless statutorily modified). Although the rule has been variously stated, it is essentially that "no person should be adjudged `by any act whatever to kill another who does not die by it within a year and a day thereafter.'" Id. Although this rule is a part of the law of the District, it does not absolve the appellant from liability for murder on the record before us because (1) the victim died within a year and a day of the assault and robbery and (2) there was no evidence upon which a reasonable juror could have concluded that the victim would have lived for a year and a day.
The rule provides for a time beyond which, the courts at common law determined, the prosecution could not, as a matter of law, prove that the unlawful act caused the victim's death. Id., quoting 3 Coke, Inst. 53. Under the rule, if the victim expires after the designated time, the defendant is not required to show that the death ensued from something other than his act. His misdeed is per se excluded from the possible causes of death. By its terms and its purpose, however, the rule is inapplicable where the victim dies within a year. Where, as in this case, the victim dies within a year, the defendant may be entitled to an intervening cause instruction, but the time period of a year and a day, and the year and a day rule would be improper subjects of instruction. See Hopkins v. United States, 4 App.D.C. 430, 439 (1894) (year and a day rule does not absolve one from liability for "homicide or murder" if death occurs within a year and a day, although proper treatment may have prolonged life beyond that time). Therefore, because the appellant's victim died within a year and a day of the infliction of the wound, this case is without the ambit of the rule, and no reversal is warranted.
The appellant is not prejudiced here by a misunderstanding of the law because, on the record, there was no evidence that the victim would have lived for a year and a day. The only relevant testimony, which the defense attorney elicited from the neurosurgeon and which appears to be dispositive of the defense's contention, is set forth below.[6] The defendant points to the italicized *1284 portion as the sole testimony regarding the rule because only it refers explicitly to the year and a day time period. We do not read it so narrowly. No reasonable juror could have concluded, on the basis of this testimony, that the victim would probably have survived for a year and a day.

IV
Our holding in this case is limited. We neither endorse nor condemn the neurosurgeon's actions. No mention has been made of the legal definition of "death" in the District of Columbia. As a matter of law, according to the evidence presented at trial, the defendant was not insulated from homicide culpability. The defendant's conviction is
Affirmed.

APPELLANT J.N.
The appellant has been convicted of attempted robbery under D.C.Code 1973, § 22-2902, and of felony murder under D.C. Code 1973, § 22-2401. He seeks reversal of both convictions because his confession, which was used at trial, was unconstitutionally elicited. As an additional reason for reversing his murder conviction, he states that the actions of the physician attending the victim constituted an "intervening cause" that insulates him from liability for murder as a matter of law.[7] We affirm. *1285 The facts will be set forth in conjunction with the discussion of the issue to which they relate.

I
The appellant's confession was not, as a matter of law, unconstitutionally elicited. The defendant admits in his brief that he was advised of his Miranda rights on "several occasions." He nevertheless contends that, because of his young age (12 years) and other factors,[8] his confession was educed without a voluntary, knowing and intelligent waiver of his rights. We are of the opinion, however, that the instant record and the pertinent case law lay to rest the appellant's contention.
Examining the record under the "totality of the circumstances" test, see In re F.D.P., D.C.App., 352 A.2d 378, 380 (1976), we find that the evidence supports the factual determination that the appellant waived his rights. Although the appellant was only 12 years old, he had been previously arrested for felonies on two separate occasions. Police officers testified that, on each of these previous encounters with the criminal justice system, the appellant was advised of his Miranda rights and had chosen to waive those rights. See In re T.T.T., D.C.App., 365 A.2d 366, 369 (1976) (juvenile's familiarity with the criminal justice system weighed in determining voluntariness). That the appellant was not accompanied by his guardian[9] is a factor to be weighed, but is not itself dispositive of the voluntariness issue. In re J.F.T., D.C.App., 320 A.2d 322, 324 (1974) (rejection of rule that juvenile's statement made in absence of parent or counsel is per se involuntary). The appellant, while complaining that his guardian did not accompany him, states that a factor going to show that the waiver of his rights was not voluntary is the admonishment by his grandmother-guardian, prior to the arrival of the police, that he confess. At the suppression hearing the appellant testified that no one forced him to confess and that he did so only because his grandmother told him to tell the police what happened.
The custodial and examining officers exercised great care in explaining to the appellant his rights in such a manner that the appellant would understand them. First, they explained relatively difficult words, such as "attorney," to assure that the appellant understood his rights. Second, they repeatedly informed him of his rights. Indeed, one might say they appeared to be encouraging him to refuse to speak. The appellant admits in his brief to having been informed of his rights on "several occasions." Police officers testified to informing him on six occasions. Third, the officers had the appellant tell them in his own words what he understood his rights to be. His response further confirms that he appreciated his rights and chose to waive them.
On this record, we find no error in not suppressing the appellant's confession. Consequently, we turn to the issue of "intervening cause."

II
The facts relevant to the "intervening cause" issue are essentially those of Parker v. United States, decided instanter. While attempting to snatch a purse from an *1286 elderly woman, the appellant and some of his friends fractured their victim's skull and further injured her head, including her brain. As her condition deteriorated, she was placed on a respirator and about a week later, following a determination of irreversible brain damage and a discussion with the victim's family, all extraordinary measures, including support from the respirator, were discontinued. The victim died shortly thereafter. The appellant, unlike his companion Parker, touched neither the victim nor her purse. Whereas in Parker the issue presented was whether there was any evidence to support a specific suggested intervening cause instruction, we here face the issue of whether the appellant is insulated from liability for murder as a matter of law, the appellant having been tried without a jury. Despite these differences, Parker mandates that we reject this contention because there was no expert testimony at trial to support a finding that the attending physician acted inappropriately in disconnecting the life support system.
The success of the appellant's defense of "intervening cause" hinges on his demonstrating that the act, for the commission of which he stands convicted of homicide, was not a "substantial factor" contributing to the victim's death. He attempts the demonstration by defining two forces or acts that impacted upon the deceased. The first act was his, the second was not. It is incumbent on him to establish that the law regards the acts as distinct from one another. See, e. g., Hamilton v. United States, 102 U.S.App.D.C. 298, 252 F.2d 862 (1958) (where victim had been rendered unconscious by defendant's blow and had then been left in roadway where she was run over by a taxi, defendant liable for death). If the acts are not separate, the perpetrator of the first is held responsible for the consequences of the second and the appellant's defense fails. Id. If the acts are distinct, the law will not punish him except for the first act. E. g., Hopkins v. United States, supra at 440. Once the acts are determined to be separate, a second issue arises: whether the first act, standing alone, was a substantial factor contributing to the death.[10] If it was, then liability will attach.[11] An adverse resolution of either of the two issues will lay the defense to rest. While the issues are listed in sequence, they may be resolved also in the reverse order.
Concerning the first issue, whether the law regards the two acts as separate, we hold that the record does not support a conclusion that the acts were separate as a matter of law. The appellant defines the first act as that which resulted in the injury to the victim's head. The discontinuance of extraordinary measures constitutes the second. The second act was performed by medical personnel acting in their role as such. Where the action of such medical personnel is either reasonable or negligent, the law holds the perpetrator of the first act liable also for the consequences of the second. For the law to deem the acts separate, the second act must descend at least below the negligence level.[12] Testimony, establishing that medical treatment is so egregious so as to fall within the category, may generally be elicited only from experts. Parker v. United States, supra. We hold that, on the record in this case, the trial judge could reasonably have concluded that the second act was a reasonable medical procedure because the sole expert testified to this effect.
*1287 As the appellant has failed to overcome the hurdle of the first issue, the second issue, of whether the first act alone constituted a substantial factor in causing the victim's death, does not arise. The conviction is
Affirmed.
NEWMAN, Chief Judge, dissenting:
I respectfully dissent. In my view, the issue is, once the evidence established that Mrs. Werlich was alive at the time of removal from the respirator, whether the jury should have been instructed that the government must prove beyond a reasonable doubt that the injury Mrs. Werlich received during the robbery would have caused her to die within a year and a day from the infliction of the wound.

I
In every criminal case the government must prove each element of the offense charged beyond a reasonable doubt. E. g., Estelle v. Williams, 425 U.S. 501, 503, 96 S.Ct. 1691, 48 L.Ed.2d 126 (1976); Egan v. United States, 52 App.D.C. 384, 393, 287 F. 958, 967 (1923). As part of this burden, in a homicide case the government must show that the defendant's conduct is both the actual cause and the legal causeor proximate cause  of the result. Actual cause means that the defendant's conduct in fact was the cause of death. Legal or proximate cause means that, although intervening occurrences may have contributed to the death, the defendant can still, in all fairness, be held criminally responsible for that death. W. LaFave & A. Scott, Jr., Handbook on Criminal Law § 35, at 248 (1972). Thus the two, if proven beyond a reasonable doubt, establish that the defendant's act was the cause of death.
In response to fact situations where two or more actors bring about one death, courts, of necessity, fashioned rules of law to determine which actor is culpable for homicide. These rules reflect an accommodation made by the courts to differing societal interests in punishing certain wrongful acts. Thus, the assailant can be convicted of homicide even though, after inflicting a blow (fatal or nonfatal), (1) the victim fails to receive or accept medical treatment, e. g., Hopkins v. United States, 4 App.D.C. 430, 438-41 (1894); State v. Donges, 126 Mont. 341, 344-46, 251 P.2d 254, 256-57 (1952); (2) the victim fails to follow physician's instructions, e. g., Warren v. State, 32 Ala.App. 273, 25 So.2d 51, 53 (1946); (3) the victim, because of his injury, takes his own life, United States v. Hamilton, 182 F.Supp. 548, 550-51 (D.D.C.1960); People v. Lewis, 124 Cal. 551, 57 P. 470, 472-73 (1899); (4) a physician administers negligent treatment, e. g., State v. McClain, 256 Iowa 175, 188-89, 125 N.W.2d 764, 771-72 (1964); Devaughn v. State, 232 Md. 447, 454-56, 194 A.2d 109, 113-14 (1963), cert. denied, 376 U.S. 927, 84 S.Ct. 693, 11 L.Ed.2d 623 (1964); (5) or a different or more skillful treatment might have saved the victim's life, State v. Cox, 82 Idaho 150, 155, 351 P.2d 472, 475 (1960). See generally Annot., 100 A.L.R.2d 769 (1965).
The underlying rationale of these decisions is that the intentional wrongdoer should bear the risk of the victim's death because the aforementioned intervening acts are considered foreseeable and natural consequences of his wrongful act. See Annot., 100 A.L.R.2d, supra at 783. Implicit in this determination of culpability is a finding that the initial wrongdoer "may fairly be held responsible for the actual result even though it does differ or happens in a different way from the intended or hazarded result." LaFave & Scott, supra § 35, at 248.
A more complex issue bearing on allocation of risk and punishment is presented when two or more intentional actors, not in concert, bring about the death of one victim. For example, A seriously wounds B, and, while B is dying, C shoots and kills B instantaneously. Some courts hold that A cannot be liable for homicide because to so hold would necessitate finding that the victim was killed twice. Id. at 250, citing State v. Scates, 50 N.C. 420 (1858); State v. Wood, 53 Vt. 560 (1881). Other courts hold that both A and C can be culpable for *1288 homicide because of the combined effects of the wounds, LaFave & Scott, supra at 250, citing People v. Lewis, supra; Commonwealth v. Costley, 118 Mass. 1 (1875), or because the injury inflicted by the first wrongdoer would have also resulted in death without the intervening act. 40 Am. Jur.2d Homicide § 16, at 307 (1968). Nevertheless, as a general rule voluntary infliction of harm by a second actor usually suffices to break the chain of legal cause and protects the original actor from, while exposing the second actor to, culpability for the homicide. See LaFave & Scott, supra § 35, at 259. In sum, when both the original actor and the intervenor inflict harm intentionally, courts differ as to whether the first actor is culpable for homicide, but all agree that the second is culpable. The latter act is considered to have shortened the life of the victim, albeit one who is already dying, and therefore, that act becomes the legal cause of the victim's death. See id. at 250.
Likewise, rules have been fashioned to allocate risk and punishment between an intentional wrongful act of one person followed by a grossly negligent act of another. As a general rule, gross negligence by an attending physician, which is the sole cause of death, will shield the first wrongful actor from homicide culpability on the theory that the wound inflicted cannot be the legal or proximate cause of death since death results from an unforeseen risk and is not a natural consequence of the wrongful act. Thus, as to the assailant, the causation element of the crime of homicide cannot be proved. See Annot., 100 A.L.R.2d, supra at § 7; LaFave & Scott, supra at 259. See People v. Calvaresi, 188 Colo. 277, 283, 534 P.2d 316, 319 (1975) (en banc).
The aforementioned rules concern themselves with fact situations involving intervening acts that are negligent, grossly negligent, or intentional and wrongful. We are faced today with a different kind of intervening act, one not contemplated by courts of earlier ages. Those courts could neither envision the artificial prolongation of life on life-support systems nor contemplate the cessation of that artificially prolonged life by doctors confronted with most difficult decisions pertaining to such prolongation. As Professor W. S. Peart has written,
Doctors regularly turn off respirators which are maintaining patients who have a normal heartbeat. They do this because they have arrived at a decision that conscious life is no longer possible with the condition present, whether it be a tumor of the brain or . . . a head injury. Since there is no spontaneous respiration, due to the brain damage, the heart will then stop beating due to lack of oxygen and death follows. This decision is being made every day, irrespective of transplantation. [Letter to the Editor, The Times, June 3, 1969, quoted in Skegg, The Termination of Life-Support Measures and the Law of Murder, 41 Mod.L. Rev. 423, 425 (1978) (emphasis by Skegg).]
These are the acts which form the basis of the so-called "pull the plug" cases. These cases require of our jurisprudence an analysis of the principles underlying our legal precedents in this area of the law. We have already noted that courts are generally interested in allocating the risk of the victim's death between the several actors who in some way contribute to the death. If we strictly adhere to the settled rules, we would have to pigeonhole this intentional act in order to allocate that risk. We could term the act negligent, relieve the physician of criminal culpability, and hold the defendant liable for homicide while ignoring the fact that the physician intentionally hastened the victim's death. Alternatively, we could term the act an intentional wrong, hold the physician responsible for death, either solely or in combination with the first intentional actor, and thereby ignore the fact that the physician "is serving a socially better end than the individual risking homicide." The Law of Homicide: Does it Require a Definition of Death?, 11 Wake Forest L.Rev. 253, 266 (1975) [hereafter Definition of Death]. Clearly, the traditional concepts are not without limitations. To pull the plug on a victim is a unique act. It is an act intentionally done *1289 to shorten life. New rules and concepts must be developed not only to protect physicians from an unrealistic application of the law, but also to protect society from assailants who might escape punishment to the full extent of the law for their wrongful acts because of medical advances.
One way to accomplish this end would be to change the definition of death from a cessation of the victim's heart and lungs to a cessation of brain functioning.[1] In this way the physician, with legal immunity, would be able to use the respirator for other patients with some hope of recovery because his conduct of pulling the plug, occurring after death, would bear no legal consequence, while the wrongdoer's conduct would expose him to homicide liability. Definition of Death, supra at 262.[2]
Another theory suggests terming the physician's act as proper medical treatment necessitated by the injury. The act of removing a patient from a respirator would then be considered a natural consequence of the injury and would play no part in legal causation. The physician escapes liability as long as his act is proper, while the assailant can be found culpable for homicide. Skegg, supra at 433-35.[3] The majority appears to adopt a version of this theory.

II
In homicide cases, death must ensue from a mortal wound within a year and a day of its infliction. If death does not take place within that period, the law draws a conclusive presumption that the injury is not the cause of death and that death was due to natural causes. If death occurs after a year and a day there can be no prosecution for homicide. 40 Am.Jur.2d Homicide, § 14, at 305; Annot., 60 A.L.R.3d 1323 (1974). This common law rule has not been abrogated by statute and is still in effect in the District of Columbia. Hopkins v. United States, supra at 439, quoting 1 Hale, Pleas of the Crown 428 (1680). See Louisville, Evansville & St. Louis R.R. v. Clarke, 152 U.S. 230, 239, 14 S.Ct. 579, 38 L.Ed. 422 (1894); 1 Wharton's Criminal Law and Procedure § 191, at 436-37 (1957). Moreover, it is axiomatic that in a criminal case the causation element, as all other elements of the crime, is a matter for the fact finder in all circumstances. Not to allow the jury to determine causation, would be for the court to direct a partial verdict for the government and usurp the role of the jury as fact finder. See Watts v. United States, D.C. App., 362 A.2d 706, 709 (1976) (en banc). To avoid this infringement on the jury's function as well as to protect the right of the defendant to a jury determination when a dispute arises concerning the cause of death, "the court may and should instruct the jury fully and clearly on the issue." 41 C.J.S. Homicide § 363, at 142 (1944). The refusal to give the instruction becomes reversible error where the evidence presents a theory of defense  that the injury was not the cause of death since the victim might have lived for more than a year and a day  and the court is apprised of this theory and particularly requested to so instruct the jury. See Levine v. United States, 104 U.S.App.D.C. 281, 282-83, 261 F.2d 747, 748-49 (1958). This rule "applies as well to situations where special facts present an evidentiary theory which if believed defeats the factual theory of the prosecution." Id. at 282. Further, the defendant is entitled to have the theory of defense instruction even if the evidence that forms the foundation for the theory is "weak, insufficient, inconsistent, or of doubtful credibility." Tatum v. United States, 88 U.S.App.D.C. *1290 386, 391, 190 F.2d 612, 617 (1951), quoting 53 Am.Jur. Trial § 580, at 458 (1945). In essence, as long as the evidence raises the issue, the instruction must be given. Womack v. United States, 119 U.S.App.D.C. 40, 40, 336 F.2d 959, 959 (1964).

III
Having set forth the foregoing legal principles, I proceed to my disagreement with the majority opinion. As I understand its holding, it is this: Where an assailant causes injuries to a victim necessitating "heroic measures" for her treatment and a physician decides to pull the plug on the still alive victim within one year of the inflicting of such injuries, to raise a jury issue, the defendant must present evidence 1) that the doctor's conduct was wrong from a medical standpoint and 2) that the victim would have lived more than 1 year. I respectfully submit that this holding turns the appropriate allocation of the burden of proof on its head. In my view, once evidence is adduced that a conscious, intentional decision was made to terminate life by pulling the plug, it became incumbent that the government be required to prove to the jury, under proper instructions, that this act was not the proximate cause of death and was thus legally irrelevant to appellant's guilt. Stated another way, the government should have been required to prove, under proper instructions, that if the plug had not been pulled, the victim would have died within a year and a day. Whether the jury, with proper instruction, would have resolved this issue adverse to appellant is not for the court to say. No matter how slight the evidence, the jury must, with proper instruction, find that the government proved its whole case, including causation, beyond a reasonable doubt, before the conviction can stand. Since this issue was not properly framed for the jury under proper instructions, I would reverse.
J.N., Jr.
The failure of the majority to appreciate and properly analyze the alleged error committed by the trial court is more apparent in J.N., Jr.'s case where the trial court precluded any testimony bearing on the fact that the victim was alive at the time of removal from the respirator. The record only reveals, from testimony of the treating neurosurgeon, that
[a]fter seven days, it was determined that the patient's brain function was irreversibly damaged [and that] it was elected not to pursue additional heroic measures, and therefore, that therapy . . . and other variety of operational procedures were not carried out. And, upon that decision, the patient's vital signs ceased to function.
The doctor further testified that the mortality rate in this type of injury after more than seven days was 95%.
The defense had reserved the right to recall the neurosurgeon to cross-examine him after a full reading of Mrs. Werlich's hospital record. From that record, the defense learned that Mrs. Werlich died only after removal from the respirator. It was the defense's contention that "but for the discontinuance, that for pulling the plug, the victim in this case may well still be living today."
The court refused to allow the recall of the neurosurgeon for cross-examination on this issue, though admitted, "[I]f the victim had continued to be physically alive for more than a year and a day following the alleged attack there would be no case of murder before the court. There might be some other charges, but that would not be one."
When the court refused to reconsider this ruling, it stated:
[A]ssuming for the purposes of determination of the motion to reconsider that [the neurosurgeon] were to be recalled and would testify that heroic measures were discontinued rather than none were employed, the court nevertheless would be faced, if the court accepted that testimony. . . with speculating as to when and in the face of the fact that is plain before all of us that this victim did in fact die, that she died under circumstances which have been evaluated by medical testimony that would effect 95% *1291 of all people in the same way, regardless of age.
* * * * * *
[T]he court is saying . . . that the introduction of that testimony, even if taken as true, does not revive the court with a basis to speculate that life would have continued for a period beyond which the charge in this case would be decisive than what it is. And the court will not reconsider its determination and will not allow the doctor to be called for that purpose.
It is too easy to suggest that the causation element was proved by the government beyond a reasonable doubt because Mrs. Werlich in fact died several days after the injury. As was previously stated, the nature of the physician's act requires that the government prove that Mrs. Werlich would have otherwise died from the appellant's wound within a year and a day from its infliction. The appellant should have been given the opportunity of raising a reasonable doubt, whether he was successful or not, that his assault on Mrs. Werlich was not the legal cause of her death  that the injury inflicted would not have caused her to die within a year and a day, and that it was only the doctor's intentional act that assured her death within this period that established appellant's culpability for homicide. To refuse to permit the witness to be recalled to give the proffered testimony constituted an abuse of discretion mandating reversal. See generally Johnson v. United States, D.C.App., 398 A.2d 354 (1979). Since the majority declines to do so, I dissent.
NOTES
[*] Disposition of the juvenile's appeal was stayed pending the argument and disposition of Parker's appeal.
[1] Heroic measures were defined at trial as

[m]easures that are other than normal supportive care. For example normal supportive care would be assuring that the patient has food to eat, that they have clothing to keep them warm, to prevent pneumonia. What I consider heroic in this case was infusions of drugs in order to reduce the pressure in the head, maintenance of the patient on a machine, when there was no obvious response to those measures of therapy in the sense of improvement in the patient's condition.
[2] All agree that under any legally accepted definition of death, the victim was not dead when the "heroic measures" were discontinued.
[3] No instruction was ever presented to the trial court. The government urges that, for this reason, this court should employ a "plain error" standard of review. See Watts v. United States, D.C.App., 362 A.2d 706 (1976) (en banc). The defendant cites to the trial transcript to support its contention that the judge understood the nature of the instruction that the defense would have proposed had it been allowed, and thus urges that the court should proceed as if a specific instruction had been requested:

THE COURT: I will give the whole thing. That there will be there for you to argue.
Do you have any defense instructions?
The government discusses an instruction with the court, whereupon the defense states:
[DEFENSE]: The theory of the defense case is the only instruction that I ask. That is
THE COURT: There is nothing here. There is no theory of the defense. You put nothing on. You made no statements.
[DEFENSE]: It comes out in the theory of cross examination.
* * * * * *
THE COURT: . . . There is no theory of the case. You presented nothing. You didn't tell us what you intended to prove. You can certainly argue extensively that which you brought out in cross-examination. There is no theory of the case. You have said nothing.
[DEFENSE]: Okay. All right.
[GOVERNMENT]: Can we just have a proffer from [the defense counsel]?
[DEFENSE]: No.
THE COURT: As to what?
[GOVERNMENT]: As to what his theory of the defense is.
THE COURT: [Government counsel], I could not care less. He is going to argue. Why should he proffer?
[GOVERNMENT]: If he has a special instruction he likes to present 
THE COURT: He is not asking any.
[GOVERNMENT]: I thought he was.
THE COURT: He is not going to tell you what his closing argument is.
[GOVERNMENT]: He said he had an instruction he wanted you to give.
[DEFENSE]: I withdrew it.
THE COURT: He withdrew it.
[GOVERNMENT]: You withdrew it?
THE COURT: He withdrew it. That is all
. . ..
The above is troublesome in two respects. First, Super.Ct.Crim.R. 30 specifies that "any party may file written requests that the court instruct the jury on the law as set forth in the requests." (Emphasis added.) Second, when the government requested the requisite written proffer, the defense attorney stated that he withdrew the instruction. We therefore question whether the instruction was ever properly before the judge and whether, if once before the court, it was thereafter withdrawn. Whether we review under the plain error standard, or as if the issue was properly preserved for appeal, the result is the same.
[4] The defendant expresses the identical test in slightly different language at pages 14 and 18 of his brief.

[T]he issue presented is [whether] given the state of the evidence, the jury could have reasonably concluded . . . that appellant was not guilty of murder because of the termination of the life support treatment.
* * * * * *
[A]ppellant's theory that [the doctor's] actions could constitute a superseding cause of [the victim's] death was properly based on. . . accepted principles of law, and the evidence presented at trial, when viewed in light of currently accepted medical practice. . .. [Emphasis added.]
As is discussed below, there was no evidence as to the "currently accepted medical practice" and hence no yardstick by which a jury could measure the propriety of the neurosurgeon's actions.
[5] It may seem a misnomer to term malpractice "willful and intentional" because "malpractice" is often equated with negligence. The term here is employed to describe medical malfeasance generally.
[6] The following took place during the cross-examination of the neurosurgeon by the defense counsel:

Q. She had a vegetative existence; is that correct?
A. Yes.
Q. Then using the word vegetable.
A. Yes.
Q. At the  at the level when one exists  has a vegetative existence, what is your prognosis?
A. As I explained before, given her age and her clinical appearance at that time, I did not feel the patient would survive.
Q. Had you during the studies of medicine ever heard of anybody surviving, for let us say, a year and a day?
A. Well, define that. I mean if you take anyone  you could have someone that is five years old. And the answer to that would be yes.
Q. All right. In other words, a person could survive for a year and a day in a vegetative condition?
A. Depending on their age and various other factors. Yes.
Q. Now, let us go to the eighty year old level  seventy-five to eighty year old level. Do you have any figures that medical science has compiled that gives statistics for people in that condition at that age that have survived?
A. No. Although, in terms of the getting back to what I was saying before in consultation with colleagues, none of my colleagues or myself have ever heard of an eighty year old, given [the victim's] condition, of surviving.
Q. But that is not to say that such had not occurred; is that correct?
A. There is no report to my knowledge of such an occurrence.
THE COURT: Excuse me, doctor. Are you suggesting you have not heard of it, or there is none out there?
THE WITNESS: I am suggesting that there is probably none out there.
BY [DEFENSE COUNSEL]:
Q. I am not being facetious, but that is in the known world where medical science is recorded. We are not speaking of like countries such as China 
A. Correct.
Q.  where we don't know. Our conversation and questions and answers are dealing with our known medical science here in the United States.
A. Correct. Yes.
* * * * * *
A younger individual  I have had cases of patients that have been in a prolonged coma and have come out reasonably intact. In terms of making a decision as far as therapy is concerned, you have to consider the  not only what the patient presents or how he presents, you have to take into consideration the age of the individual.
For example, as I indicated before, if I had a child with a vegetative state after a head injury, even if that child were in a coma for six weeks to a year, or even two years, there is still a potential of that child returning to a somewhat normal existence.
In terms of adults, younger adults have a potential of some recovery, despite prolonged coma. The older the individual becomes, the less likely a functional recovery.
Getting into the over fifty and sixty age group, literally in the hundreds that my colleagues and I and our various colleagues in neurosurgery have treated in this area and throughout the United States  I might add to begin with everyone, no matter what their age, from one day old to ninety years old, given the particular condition that [the victim] was in, taking all age groups, the mortality is ninety percent across the United States, taking all age groups.
Now, if you start talking about specific age groups, and when you start talking about the age group fifty or sixty and above, given [the victim's] condition, the mortality rate is one hundred percent.
Q. You are giving no chance of recovery; is that right?
A. That is correct.
Q. Well, when you say no chance of recovery that is no chance of recovery as a normal person?
A. My prognosis was no chance for recovery.
[DEFENSE COUNSEL]: I have no further questions. [Emphasis added.]
[7] The issue on which the dissent is based in J.N. was not raised by the appellant's counsel. We agree with counsel's implicit conclusion that the issue does not merit discussion on appeal. In any case, because the issue was "not discussed in the brief of counsel for [appellant],. . . it will therefore be considered as abandoned." Wardman-Justice Motors, Inc. v. Petrie, 59 App.D.C. 263, 267, 39 F.2d 512, 517 (1930). Rose Lees Hardy Home and School Ass'n v. District of Columbia Board of Zoning Adjustment, D.C.App., 343 A.2d 564, 567 (1975); Democratic Central Committee of the District of Columbia v. Washington Metropolitan Area Transit Comm'n, 158 U.S.App. D.C. 7, 11 n. 16, 485 F.2d 786, 790 n. 16 (1973) cert. denied, 415 U.S. 935, 94 S.Ct. 1451, 39 L.Ed.2d 493 (1974); Watwood v. Credit Bureau, Inc., D.C.Mun.App., 97 A.2d 460 (1953).
[8] As additional factors, the appellant states that he was escorted only by a 17 year old cousin when he was taken to the police station, that he was taken at 10:15 p. m. and interrogated "by up to four skilled, adult homicide officers in the middle of the night," and that he was "admonished by his grandmother/guardian to confess."
[9] The appellant's grandmother was his guardian. Due to her illness, she chose not to accompany the appellant and sent her oldest grandson in her stead.
[10] For example, a defendant may persuade the fact finder that, subsequent to his shooting the victim, the victim was fortuitously shot again by an unknown and unrelated assailant, and that the victim died from the loss of blood from both wounds. Although the defendant may have demonstrated that he is not liable for the consequences of the acts of the second assailant, his defense of intervening cause will nevertheless fail if the wound inflicted by the defendant substantially contributed to the decedent's death. People v. Arzon, 92 Misc.2d 739, 401 N.Y.S.2d 156 (1978) (victim died as result of two fires, only one of which set by defendant; defendant liable for second degree murder).
[11] E. g., People v. Saldana, 47 Cal.App.3d 954, 121 Cal.Rptr. 243 (1975) (death occurred prior to removal of artificial life support systems).
[12] E. g., State v. Johnson, 56 Ohio St.2d 35, ___, 381 N.E.2d 637, 640 (1978); W. LaFave & A. Scott, Criminal Law 259 (1972).
[1] For further discussion of brain death and its effects upon both doctor and defendant, see Guthrie, Brain Death and Criminal Liability, 15 Crim.L.Bull. 40 (1979).
[2] As the majority correctly perceives, such an approach would be of no assistance in this case since all concede that the victim was alive under any legally accepted definition of death when the plug was pulled.
[3] Professor Skegg broadens a theory first expressed by Lord Devlin in Samples of Lawmaking at 95 (1962). Lord Devlin was speaking of proper and necessary treatment to relieve pain and suffering. Professor Skegg includes within this theory withdrawal of a patient in an irreversible comatose state from a respirator. Skegg, supra at 433.